**Affirm and Opinion Filed January 27, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00316-CR

**CARLOS MEDRANO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 439th Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 2-11-418**

## OPINION

Before Justices FitzGerald, Francis, and Myers
Opinion by Justice Francis

Following a bench trial, suspended Dallas County Justice of the Peace Carlos Medrano was convicted of illegal voting and sentenced to five years in prison, probated for five years, and a $2,500 fine.[1] In eight issues, appellant brings complaints regarding the jurisdiction of the court, the sufficiency of the evidence, and the admission of certain documents. Because we conclude all issues are without merit, we affirm the trial court's judgment.

Appellant won the March 2010 Dallas County Democratic Party Primary Election for the office of Precinct 5, Place 1 Justice of the Peace, defeating the incumbent Luis Sepulveda by 156

---

[1] The trial court, after finding it was in the public interest, ordered appellant suspended from office pending his appeal. *See* TEX. LOC. GOV'T CODE ANN. § 87.032 (West 2008).

votes. Shortly after the election, allegations of voter fraud surfaced and Sepulveda filed a civil lawsuit. The Dallas County Commissioners Court requested the Attorney General of the State of Texas investigate the allegations. The AG's office investigated the complaint, which included the allegation that some members of the Medrano family had registered voters to vote in the JP election who did not reside in that precinct. The AG's office presented the case to the Rockwall County grand jury, which ultimately indicted eight members of the Medrano family, including appellant. Appellant was charged in a two-count indictment with soliciting and aiding his nieces, Raquel and Veronica Medrano, to vote for him when he knew they did not reside in the precinct for which he was running.

On December 29, 2011, appellant and seven family members appeared before the trial court in Rockwall County, entered pleas of not guilty, and waived their right to a jury trial. The State and defense announced ready, and the State presented some evidence in each case. Appellant's case was recessed until February 14, 2012. The trial court noted this process facilitated the scheduling of all the cases and ensured the parties could not change their jury elections.

On that date, the joint trial of appellant and his brother, Frank Medrano III, reconvened. After hearing the evidence, the trial court acquitted appellant on the illegal voting charge involving Raquel and convicted him on the illegal voting charge involving Veronica. (Frank, who is the father of Raquel and Veronica, was acquitted of aggravated perjury.) In this appeal, we focus on the evidence relating to the charge involving Veronica.

Veronica was granted immunity from prosecution for her testimony. She testified she was living with her parents at 2408 Boardwalk Drive in Mesquite in December 2009. On Christmas Eve, she went to a Medrano family Christmas party at her aunt's house. Appellant was at the party and told her he was running for JP. Veronica said appellant handed her a voter

–2–

registration card and asked her to change her address to 2331 Douglas Avenue in Dallas, the residence of their uncle, Rolando Medrano. Unlike Veronica's Mesquite address, Rolando's address fell within the precinct for the race in which appellant was running. Veronica filled out the card listing the Douglas Avenue address and gave it to appellant. Veronica testified she never lived or intended to live at 2331 Douglas and never told anyone she intended or wanted to live there.

During early voting in February 2010, appellant called Veronica to tell her to go vote. He told her if anyone asked where she lived, she was to say she lived at the Douglas Avenue address or in Dallas. Veronica and other family members met appellant, and appellant led them to an early-voting polling place, where she voted for him for JP.

Shortly after the election, Sepulveda filed a lawsuit contesting the election results and was looking for people who may have voted illegally. Veronica's boyfriend, Austin Stark, asked her about it. Veronica told Stark she did not vote in the election, although voting records showed she did, which led Stark to believe her family had used her vote without her knowledge. At Stark's urging, Veronica met with Sepulveda and told him she did not vote in the election.

In June, during the pendency of Sepulveda's lawsuit, Sgt. Jennifer Bloodworth and another investigator with the AG's office went to the Medranos' Mesquite residence to talk to Veronica and Raquel about the circumstances of their voting. Veronica agreed to talk to Sgt. Bloodworth, but Raquel refused. Veronica initially told Sgt. Bloodworth she did not live at the Douglas Avenue address, denied signing her voter registration application form, said she did not remember signing her personal appearance form for early voting, and denied voting in the March 2010 Primary Election. By the end of the meeting, she had acknowledged signing the voter registration form and early voting form, but continued to deny voting. She said she was reluctant

to tell Bloodworth the truth about the circumstances of her voting because she feared "backlash" from her family but eventually admitted that she did vote in the election.

Ultimately, Veronica was subpoenaed to testify at Sepulveda's July 2010 election contest trial. On the day before she was scheduled to testify, Veronica said her father showed up at her work and had her follow him to a meeting with appellant and two other Medrano family members. At the meeting, Veronica said they "went over" what she was "supposed to say" at the trial the next day, which, she explained, was "[b]asically, a bunch of 'I don't knows' and 'I don't remember.'" Veronica was told to testify she was living on Douglas Avenue when she voted in the election. Afterwards, Veronica told her sister, Raquel, about the meeting.

The next day, contrary to how she was told to testify at the meeting, Veronica testified she voted for appellant but did not live on Douglas Avenue and never intended to live on Douglas Avenue when she cast her vote. That night, Raquel received a Facebook message from her cousin, Nina Medrano Dominguez, asking what had happened with Veronica. Raquel replied, in part, as follows:

> Hey nina! idk if you knew this, but when Carlos was running for the election he had asked Veronica and I to change our address currently to say that we lived with [Rolando] so we could vote for him. Well, we were told after we voted for him that if anyone question us all we had to say was that we live at the Douglas address. it's reasonable because we both go to school in Dallas and I worked around the area. idk what [Veronica's] deal is now, but she has completely gone against us since she ended up on the news along with my name . . . Well, since Carlos was in court this past week, [Veronica] got served on Monday and had to appear today. . . Veronica met with my dad, Carlos, Robert, your grandpa, and Sylvia last night to go over some questions that she would be asked and how to answer them. Apparently, she seemed okay with it, but I had known she went behind our family's back a long time ago. Her and her boyfriend went and talked to Carlos's opponent a while back, kept in touch with him up until the investigation. . . . So, today in court she told them Carlos lives with Erica at Rotan Lane and the truth, but she totally went behind our backs by NOT saying all this stuff they discussed with her last night. . . I can't believe she would do this to us, I feel completely betrayed because idk if she is still upset at me for something that happened a while back or if she's mad at the family? No one knows, I should know better than anyone yet, I have no clue why she didn't say what she was supposed to say. . . .

–4–

Veronica testified when she filled out the voter registration application with the incorrect address in December 2009, she believed it was "okay" because "nobody stepped in to say it was wrong." She testified she did not know she was ineligible to vote, although she testified she knew it was not true when she represented she lived at the Douglas Avenue address on her voter registration application, she did not reside at the Douglas Avenue address on the day she voted, she knew she was not a resident of the precinct in which appellant ran for JP, and she knew that to vote in the election, she had to lie on her voter registration card.

Bloodworth, the criminal investigator with the AG's office, testified she investigated the voter fraud allegations. She said she met with Veronica for the first time in June 2010 when she went to the Medrano residence in Mesquite. Both Raquel and Veronica were there, but only Veronica agreed to talk to her. At first, Veronica said she did not vote in the election but, at some point, admitted she did. Over the course of the investigation, Veronica told Bloodworth that her family told her it was okay to vote in appellant's race so she thought she was eligible to vote. Bloodworth testified that Veronica, who was nineteen years old at the time, "had no reason to believe she was voting illegally" and, when asked, Bloodworth agreed that Veronica did not know she was ineligible to vote.

As part of her investigation, Bloodworth obtained various documents relating to Veronica's residency and voting. Documents showed Veronica voted at the Grauwyler Park Recreation Center on February 16, 2010, with other Medrano family members, including appellant. Admitted into evidence were the certified copies of the Combination Form for Early Voting by Personal Appearance of each voter at Grauwyler on February 16. Bloodworth explained the forms were numbered in the top right-hand corner, and the number typically represented the order in which the voter arrived or was checked in at the polling place. Appellant's form was marked number 20; Veronica's and Raquel's were marked 24 and 25.

Documents also showed that, in December 2009, Veronica filled out a voter registration application and listed her residence as 2331 Douglas in Dallas, which fell within in JP, Precinct 5. However, Veronica's employment records, student records at El Centro College, and driver's license all showed an address of 2408 Boardwalk in Mesquite, which fell within in JP, Precinct 2. Bloodworth said she found no evidence that Veronica ever lived or stayed at the Douglas Avenue address. Bloodworth also obtained the Facebook conversation between Raquel and Nina in which Raquel related information about (1) the Christmas party and appellant's request, (2) the meeting at which appellant and other family members told Veronica how to testify at the civil trial, and (3) Veronica failing to testify as she was told.

Raquel, who was indicted for illegal voting and given immunity from prosecution, testified she had lived at 2331 Douglas Avenue since January 2009. Similar to Veronica's testimony, she said she filled out a voter registration card changing her address to Douglas Avenue at the family Christmas party. She said she believed it was at appellant's request, but was "not certain." On the day she voted, she said appellant called or texted her that it was "early voting" and she and Veronica went that day in separate cars and voted at Grauwyler Park Recreation Center. Although Veronica never lived at 2331 Douglas Avenue, Raquel testified she heard Veronica on many occasions voice her intent to move to the Medrano community in the Douglas Avenue–Knight Street area of Dallas.

Robert Edward Medrano, appellant's second cousin, was also charged with illegal voting. He testified he voted for appellant the same day appellant called him several times "to make sure" he and his wife voted. When the voter fraud investigation began, Robert said he refused to testify before the grand jury and was ultimately indicted. Since he has been under indictment, Robert said appellant has told him if they "all stick together, everything will be okay." But Robert said things continued to get worse, so instead of using the lawyers representing the other

family members, he hired his own attorney and began to cooperate with the State. Until that point, he said only Veronica had cooperated. He testified other family members call Veronica "Fredo," an apparent reference to the brother in the "Godfather" movie who betrayed the family.

Finally, the State also offered appellant's grand jury testimony. Appellant denied asking Raquel or Veronica to register to vote in his precinct, denied speaking to them about registering to vote, and denied asking them to vote for him. He said that Raquel called him during early voting and asked where she was supposed to vote. He tried to give her directions, but she did not understand him, so he met her at his house. Raquel and Veronica showed up in separate cars, and they followed him to the Grauwyler polling place. He initially testified he did not go into the polling place, but when shown his voting form, said he had "forgotten" he voted early that day and acknowledged he was at the polling place at the same time as Raquel and Veronica.

Appellant acknowledged he knew it would be illegal for Raquel and Veronica to vote in his election if they lived in Mesquite and it would be illegal for them to change their registration to Dallas if they lived in Mesquite. When asked about the "family meeting" with Veronica the night before she testified in Sepulveda's lawsuit, he denied discussing her testimony with her. He suggested Veronica brought the false allegations because she was angry that the family would not pay for her to return to college in Missouri.

Rolando Medrano, who was under indictment for perjury, testified for the defense. He testified that the Medranos own several properties in the Douglas Avenue–Knight Street area, and as many as 225 family members live there. In 2009, Raquel moved into his house, and later that year, Veronica asked if she too could move in. Rolando testified Veronica drove up to his house at 2331 Douglas, got out of the car, and asked if she could move in. Rolando said he told her she could, and although he said she never moved in, he believed those facts constituted

–7–

residency. Rolando testified he told Carlos around Christmas 2009 that Raquel lived with him and Veronica might also be moving in.

Veronica's father, Frank, testified his daughters filled out voter registration cards at the family Christmas party in 2009, showing the Douglas Avenue address. On the way home from the party, he told them if they planned on moving in with Rolando, they would have to be prepared to "live by his rules." He said Veronica moved out shortly after that, and he believed she was living with Rolando. On cross-examination, he admitted that when he testified before the grand jury, he did not mention the conversation in the car on the way home from the party. Also, he said Veronica never told him directly that she intended to move in with Rolando, only that she told someone else but he did not know whom.

In his first and second issues, appellant contends his conviction is void because his prosecution in Rockwall County by the AG violated the separation of powers provision of the Texas Constitution. Specifically, appellant complains the legislature's enactment of chapter 273 of the Texas Election Code impermissibly vests the AG, a member of the executive branch, with criminal prosecutorial authority, although the constitution vests that power in the county and district attorneys, members of the judicial branch.

Chapter 273 of the Texas Election Code governs criminal investigation and other enforcement proceedings. Section 273.021 provides that the AG "may prosecute a criminal offense prescribed by the election laws of this state" and appear before a grand jury in connection with that prosecution. TEX. ELEC. CODE ANN. § 273.021(a), (b) (West 2010). The AG's authority, however, does not "affect the authority derived from other law to prosecute the same offenses." Id. § 273.021(c). An election code offense may be prosecuted in the county in which the offense was committed or an adjoining county. Id. § 273.024. The AG may direct the

county or district attorney serving the county in which the offense is to be prosecuted to prosecute the offense or to assist the AG in the prosecution. *Id*. § 273.022.

The Texas Constitution expressly divides the powers of government into three distinct departments—legislative, executive, and judicial—and prohibits the exercise of any power "properly attached to one" from being exercised by the others, unless that power is grounded in a constitutional provision. TEX. CONST. art. II, § 1. "This separation of powers provision reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990). It has the incidental effect of "promoting effective government by assigning functions to the branches that are best suited to discharge them." *Id*. The doctrine requires that "any attempt by one department of government to interfere with the powers of another is null and void." *Meshell v. State*, 739 S.W.2d 246, 252 (Tex. Crim. App. 1987). Although one department has occasionally exercised a power that would otherwise seem to fit within the power of another department, our courts have approved those actions only when authorized by an express provision of the constitution. *Id*.

The separation of powers provision may be violated in one of two ways. First, it is violated when one branch of government assumes, or is delegated, to whatever degree, a power that is more "properly attached" to another branch. *Armadillo Bail Bonds*, 802 S.W.2d at 239. Second, it is violated when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers. *Id*.

> The undue interference test takes the middle ground between those who would seek rigid compartmentalization and those who would find no separation of powers violations until one branch completely disrupted another branch's ability to function. The rigid compartmentalization theory undermines the efficiency of the government and undervalues the availability of checks and balances. The

other extreme looks only for the completed coup and underestimates the incremental effect of interbranch intrusions.

*Id.* (quoting N. McCabe, *Four Faces of State Constitutional Separation of Powers: Challenges to Speedy Trial and Speedy Disposition Provisions*, 62 TEMPLE L. REV. 177, 218 (1989)).

The offices of county and district attorney are in the judicial branch of government. TEX. CONST. art. V, § 21;[2] *Saldano v. State*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002). Although the duties of the county and district attorney are not enumerated in Article V, Section 21, our courts have long recognized that, along with various civil duties, their primary function is "to prosecute the pleas of the state in criminal cases." *Meshell,* 739 S.W.2d at 254; *see also Saldano*, 70 S.W.3d at 876 (explaining that present constitution gives authority to prosecute criminal cases to county attorneys, criminal district attorneys, and district attorneys, under regulation of legislature, which has regulated duties of district attorneys and county attorneys by giving them authority to prosecute criminal cases).

The AG, on the other hand, is in the executive branch. TEX. CONST. art. IV, § 1; *Saldano*, 70 S.W.3d at 879. The constitutional duties of the office are described as follows:

> The Attorney General shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and *perform such other duties as may be required by law*.

TEX. CONST. art. IV, § 22 (emphasis added).

---

[2] Article V, Section 21 of the Constitution provides, in part:

> The County Attorneys shall represent the State in all cases in the District and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a District Attorney, the respective duties of District Attorneys and County Attorneys shall in such counties be regulated by the Legislature.

TEX. CONST. art. V, § 21.

This clause provides legislative authority to empower the AG with other duties. *See Brady v. Brooks,* 89 S.W. 1052, 1056 (Tex. 1905) (explaining constitutional provision regarding county and district attorneys did not preclude legislature, under Article IV, Section 22, from empowering AG to likewise represent State in district court); *Meshell*, 739 S.W.2d at 254; *El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438–39 (Tex. 1996); *Hill v. Lower Colo. River Auth.*, 568 S.W.2d 473, 477 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.).

Appellant argues the election code provisions violate separation of powers by both unlawfully delegating power to the executive branch that is more properly attached to the judicial branch and by unduly interfering with the judicial branch's constitutionally assigned powers. He asserts the Dallas County District Attorney, through the grand jury, declined to prosecute this case "because the grand jury refused to indict." Therefore, he argues, allowing the AG to prosecute this case in any county "circumvents, overrides, and usurps the power" of Dallas County District Attorney over this case, unduly interfering with the judicial branch while overburdening the Rockwall County District Attorney with responsibility for a case it should not have.

The Texas Constitution vests the AG with authority to "perform other duties as may be required by law." TEX. CONST. art. IV, § 22. This broadly worded express provision gives the legislature the right to impose "other duties" on the AG and provides the specific exception required to allow the legislature to alter the constitutional duties of the county and district attorneys. *See Meshell*, 739 S.W.2d at 254–55 (recognizing legislature cannot remove or abridge district attorney's exclusive prosecutorial function unless authorized by an express constitutional provision); *Saldano*, 70 S.W.3d at 880 ("[The Texas Constitution] authorizes the legislature to give the attorney general duties which, presumably, could include criminal prosecution.").

Appellant's argument is premised on the notion that county and district attorneys fall squarely into the judicial branch and the AG into the executive branch. But our courts have acknowledged otherwise. For instance, in *Meshell*, the court noted that some duties of county and district attorneys might more accurately be characterized as executive in nature. *Meshell*, 739 S.W.2d at 253 n.9. Likewise, in *Brady*, the supreme court determined that the duties imposed upon the AG are both executive and judicial. *Brady*, 89 S.W. at 1056.

*Brady* involved a dispute between the county and district attorney and the AG over who had authority to prosecute suits against an oil company and railroad company for taxes and penalties owed to the State under separate statutes, both of which vested authority in the AG. *Id*. at 1053. In analyzing the issue, the court determined that the articles of the constitution setting out the roles of the AG and the district and county attorneys "must be construed together" because they involve the same subject matter. *Id*. at 1056. The court attached no importance to the fact that the "definition and duties and powers" of the AG are placed in Article IV, the executive branch. The court further noted the AG "might appropriately have been placed" in Article V, and determined "it should be construed precisely as if it had been so placed." The court acknowledged, however, that the legislature could not "take away from the county attorneys so much of their duties as practically to destroy their office." *Id*. at 1054.

Allowing the AG to prosecute election code violations does not take away from the district attorney so much of his duties as to "practically destroy" his office. By enacting chapter 273, the legislature did not remove the authority of county and district attorneys to prosecute election code violations; it merely provided that the AG could do so independently. *See* TEX. ELEC. CODE ANN. § 273.021(c). This is not an instance where the Dallas County District Attorney was prosecuting the case and the AG initiated a separate prosecution in Rockwall County. Rather, for reasons not set out clearly in the record, the case was not being prosecuted

in Dallas County.[3]  In fact, the Dallas County Commissioners Court formally requested the AG to "come forward and investigate incidents of voter fraud in Dallas County during the recent primary election."

Our courts have long recognized the legislature may have sound reasons for having a statewide agency pursue some claims in place of the district or county attorney.  *See Brady*, 89 S.W. at 1056.  Generally speaking, as the State argues here, this statute allows the AG to "step in" when election violation cases may be "politically sensitive" at the local level, which could discourage local prosecutors from acting.  We conclude the legislature's enactment of chapter 273 does not delegate a power to one branch that is more properly attached to another nor does it allow one branch to unduly interfere with another.  Because chapter 273 does not violate the separation of powers doctrine, we overrule issues one and two.

In his third issue, appellant argues that even if the statutes are constitutional, the AG, the Rockwall County grand jury, the Rockwall County district attorney, and the Rockwall County district court had no jurisdiction because there was no deputation order for the assistant AGs to prosecute this case.  To support his argument, he relies on *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921 (Tex. Crim. App. 1994).

In *Pirtle,* the district attorney signed deputations appointing two assistant AGs to serve as assistant district attorneys in certain pending criminal cases.  887 S.W.2d at 923.  The defense filed motions to prohibit the assistant AGs from serving as assistant district attorneys and raised several grounds.  The trial court ultimately granted the motion, concluding the attorneys had no prosecutorial authority by virtue of their status as assistant AGs and the deputation order was

---

[3] Lenny James, one of the members of the grand jury that indicted appellant, testified they were told by the AG that "the case was coming out of Dallas because I believe Dallas refused to indict on the case, Dallas refused to hear the case, and they had evidence to the contrary."  James was then asked, "And so when they came to you the first time, they told you, Dallas County didn't want to have anything to do with this."  James responded, "Basically, yeah."

void. *Id*. at 924–25. The district attorney sought mandamus relief. The court of criminal appeals granted the mandamus and ordered the trial judge to vacate his order. The court explained that the district attorney had statutory authority to staff his office and, so long as the assistant AGs acted under his direction, there was no separation of powers violation. *Id*. at 927–28.

We conclude *Pirtle* is distinguishable from the facts in our case. In *Pirtle*, the assistant AGs did not have statutory authority to prosecute the cases independent of the local district attorney. Rather, the statute authorizing their appointment simply gave the district attorney authority to hire any assistant prosecuting attorneys that he deemed necessary to operate his office. *Id*. at 927. In this case, however, the AG has statutory authority to prosecute election code violations independently from the district attorney. *See* TEX. ELEC. CODE ANN. § 273.021. Further, that authority includes the ability to appear before the grand jury and to try the case in an adjoining county. *Id*. §§ 273.021(b), 273.024. Thus, whether the Rockwall County district attorney deputized the AGs or whether she had jurisdiction to prosecute these cases is not relevant. Because the AG had independent statutory authority to prosecute these cases, and such authority was constitutional, we conclude no deputation order was required. We overrule the third issue.

In his fourth issue, appellant contends his conviction is void because the indictment failed to state an offense and thus failed to vest jurisdiction in the trial court.

To constitute an indictment, the charging instrument must charge a person and the commission of an offense. *Teal v. State*, 230 S.W.3d 172, 179 (Tex. Crim. App. 2007). Without both of those elements, the charging instrument is not an indictment and does not vest the district court with jurisdiction. *Id*. The proper test to determine if a charging instrument alleges "an offense" is whether the allegations in it are clear enough that one can identify the offense

–14–

alleged. *Id*. at 180. If they are, then the indictment is sufficient to confer subject matter jurisdiction. *Id*. "Stated another way: Can the trial court (and appellate courts who give deference to the trial court's assessment) and the defendant identify what penal code provision is alleged and is that penal code provision one that vests jurisdiction in the trial court?" *Id*.

A person commits illegal voting if the person "votes or attempts to vote in an election in which the person knows the person is not eligible to vote[.]" TEX. ELEC. CODE ANN. § 64.012(a)(1) (West Supp. 2013). To be eligible to vote in an election, a person must, among other things, "be a resident of the territory covered by the election for the office or measure on which the person desires to vote." TEX. ELEC. CODE ANN. § 11.001(a)(2) (West 2010).

Here, the indictment alleged that appellant

on or about the 16th day of February, 2010, and before the presentment of the indictment, in Dallas County, Texas, a county adjoining Rockwall County, did then and there, acting to promote or assist the commission of the offense, solicit, encourage, direct, or aid Veronica Medrano to vote in an election in which Veronica Medrano knew she was not eligible to vote, to wit: Veronica Medrano voted in the March 2010 Dallas County Primary Election *when she did not reside in the precinct in which she was voting . . . .*

(emphasis added).

Appellant argues the indictment failed to allege Veronica was not a resident of the territory covered by the election; rather, it alleged she did not reside in the precinct in which she was voting. Appellant argues that because a qualified voter registered in Dallas County can vote at any polling place during early voting, the fact that Veronica voted when she did not "reside in the precinct in which she was voting" was not an offense and did not make her ineligible to vote. Consequently, he concludes the indictment failed to state an offense. We disagree.

In *Duron v. State*, 956 S.W.2d 547 (Tex. Crim. App. 1997), the defendant was indicted on a charge of indecency with a child. The indictment contained all of the statutory elements comprising a criminal offense: it charged appellant, acting with intent to arouse his own sexual

desire, had sexual contact with a child younger than seventeen years of age who was not his spouse. *Id*. at 551. The defendant, however, complained the instrument also contained factual allegations that, if true, established he was not guilty of the offense; in particular, the indictment alleged the sexual contact between appellant and the child occurred when appellant rubbed his penis between her legs. *Id*. Because legs were not included in the areas defined by sexual contact, the defendant argued the indictment did not charge the commission of an offense and did not confer jurisdiction on the trial court. *Id*.

The court of criminal appeals disagreed, concluding the indictment charged the commission of an offense. The court explained that regardless of the inclusion of factual allegations that arguably evidence the defendant's innocence, "there is no doubt the State intended to accuse appellant of indecency with a child, and appellant does not claim otherwise." *Id*.

Here, the indictment alleged Veronica voted when she did not reside in the precinct *in* which she was voting instead of alleging she did not reside in the precinct *for* which she was voting. Nevertheless, as in *Duron*, the indictment contained all of the statutory elements of illegal voting. Further, the caption clearly stated the offense as illegal voting, identified the election code provision, and identified it as a third-degree felony. That it contained a factual allegation that might arguably evidence appellant's innocence did not void the indictment. Appellant's remedy was to object before trial so that it could be amended. We overrule the fourth issue.

In his fifth, sixth, and seventh issues, appellant contends the evidence is insufficient to support his conviction. In particular, he argues the State failed to prove beyond a reasonable doubt that (1) he acted to promote the illegal voting of Veronica, (2) Veronica knew she was not eligible to vote, and (3) he knew Veronica was not eligible to vote.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* Direct and circumstantial evidence are treated equally. *Id.*

As shown above, the indictment alleged appellant was a party to Veronica's illegal voting. A person is criminally liable for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). In determining whether appellant participated as a party, we may consider events occurring before, during, and after the commission of the offense to show an understanding and common design to commit a prohibited act. *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000).

We begin with appellant's fifth issue in which he contends the evidence is legally insufficient to support his conviction as a party because Veronica was an accomplice as a matter of law and the State failed to corroborate her testimony. Specifically, he argues the only evidence corroborating Veronica's testimony was late-filed evidence that was improperly admitted. This evidence includes the Facebook conversation between Raquel and Nina, Veronica's sister and cousin. But evidence, whether properly or improperly admitted, is considered in a legal sufficiency review, *see Clayton*, 235 S.W.3d at 778, and a challenge to the

–17–

sufficiency of the evidence to corroborate the testimony of an accomplice is a challenge to the sufficiency of the evidence to support the verdict on guilt. *Munoz v. State*, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993). Consequently, to the extent appellant suggests we cannot consider the Facebook evidence or any other evidence only because it was not timely filed, we disagree.

To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the defendant with the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Corroboration is not sufficient if it merely shows the offense was committed. *Id.* In making our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007).

The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense alleged in the indictment. *Id.* It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). Judicial experience shows that no precise rule can be formulated as to the amount of the evidence that is required to corroborate the testimony of an accomplice. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

The Facebook evidence, by itself, corroborates Veronica's testimony that appellant was a party to her illegal voting. In the message, Raquel tells Nina that (1) appellant asked her and

–18–

Veronica to change their address to the Douglas Avenue address so they could vote for him for JP, (2) after they voted for appellant, they were told to say they lived on Douglas Avenue if anyone questioned them, (3) Veronica met with appellant and other family members the night before she was to testify "to go over some questions that she would be asked and how to answer them" at the civil trial, and (4) Veronica did not "say what she was supposed to say."[4]

This evidence corroborates Veronica's testimony that appellant asked her to register to vote using Douglas Avenue as her residence address, where she did not reside and did not intend to reside, so that she could vote for him. It also corroborates her testimony that appellant told her to say she lived on Douglas Avenue if anyone questioned her. Finally, it corroborates her testimony about the meeting at which appellant and other family members encouraged her to lie at the election contest trial about her residency.

In addition to the Facebook message, other corroborating evidence exists. Robert Medrano, who was also charged with illegally voting using an address at which he did not reside, testified appellant called him to go vote, a circumstance similar to Veronica's testimony that appellant called to remind her to vote. Robert, who is Veronica's cousin, also said that after the investigation began, appellant told him if they "stuck" together, "everything will be okay." This supports Veronica's testimony that appellant told her to say she lived on Douglas Avenue and encouraged her to lie about her residence at the civil trial. Finally, voting records establish that appellant cast his vote five people before Veronica and Raquel at the same polling place, which supports Veronica's testimony that appellant took her and Raquel to vote.

---

[4] Appellant does not argue Raquel is an accomplice to the offense or treat her as such in his brief, although the State asserts she is. Even if she is an accomplice, an issue we need not decide, the Facebook evidence is proper corroborating evidence. *See Maynard v. State*, 166 S.W.3d 403, 413–14 (Tex. App.—Austin 2005, pet. ref'd) (using one accomplice's out-of-court statement to corroborate another accomplice witness's testimony); *see also Johnson v. State*, 354 S.W.3d 491, 495 (Tex. App.—San Antonio 2011, pet. ref'd) (recognizing distinction made in *Maynard* that one accomplice's out-of-court statement may corroborate the in-court testimony of another accomplice, but out-of-court testimony of a testifying accomplice cannot be used to corroborate his own testimony).

Disregarding Veronica's testimony, we conclude there was sufficient evidence tending to connect appellant as a party to the offense. Further, when we consider all of the evidence, including Veronica's testimony, we conclude the evidence is sufficient to establish appellant solicited, encouraged, directed, or aided Veronica to vote. We overrule the fifth issue.

In his sixth issue, appellant contends the evidence is insufficient to prove that Veronica knew she was not eligible to vote. Appellant argues the State was required to prove Veronica knew she was voting and subjectively knew she was "not legally authorized to vote." He argues the State failed to prove the latter "because all of the evidence was that she did not know" she was ineligible to vote. As evidence, he directs us to the testimony of Veronica and Bloodworth.

The State challenges the premise of appellant's argument—that it must prove Veronica knew she was ineligible rather than proving she knew the circumstances rendering her ineligible. The State asserts Veronica knew she never lived on Douglas Avenue nor intended to, nevertheless registered to vote from that address, and knew she was not a resident of Douglas Avenue on the day she registered and the date she voted. It argues that the "gist" of appellant's argument is "that if Veronica did not know what she was doing was illegal, she cannot have voted illegally." We agree with the State.

Section 64.012 provides four different ways that a person can commit illegal voting. TEX. ELEC. CODE ANN. § 64.012(a). One way is to vote in an election in which a person knows she is not eligible to vote. *Id*. § 64.012(a)(1). To be eligible to vote in an election in this state, a person must, among other things, "be a resident of the territory covered by the election for the office or measure on which the person desires to vote." *Id*. § 11.001(a)(2). Thus, in this case, we conclude the State was required to show Veronica voted in an election knowing she was not a resident of the territory covered by the election for the office on which she desired to vote.

We find support for our conclusion in *Thompson v. State*, 26. Tex. App. 94, 9 S.W. 486, 486 (1888), a case with similar circumstances.  In *Thompson,* the defendant, a felon, was charged with illegal voting.  At the time, the law disqualified any person convicted of a felony from voting.  *See* Act approved Aug. 23, 1876, 15th Leg., R.S., ch. 166, § 13, 1879 Tex. Gen. Laws 252, *reprinted in* 8 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 307 (Austin, Gammel Book Co. 1898) (version found at TEX. REV. CIV. STAT. ANN. art. 1687, 1879 codification).  The penal code in effect at the time provided: "If any person knowing himself not to be a qualified voter, shall, at any election, vote, or offer to vote, for any officer to be then chosen, he shall be punished by confinement in the penitentiary not less than two nor more than five years." TEX. PENAL CODE art. 165 (1879 codification).[5]

At his trial, the jury was instructed that "[i]f the defendant had been convicted of an assault with the intent to murder, as alleged in the indictment in this cause, and if he knew at the time he so voted that he had been so convicted, such knowledge of his conviction would be equivalent in law to knowing himself not to be a qualified voter."  *Thompson*, 9 S.W. at 486. The defendant argued on appeal that the instruction was "erroneous in principle" and was a comment on the weight of the evidence. The court concluded the instruction was "correct and unobjectionable," explaining that everyone is conclusively presumed to know the law.  Since the defendant knew he had been convicted of assault with intent to murder, the court explained it must be conclusively presumed he knew the legal consequences of his conviction, one being he was not qualified to vote.  *Id*.

In *Thompson,* the defendant was charged with voting "knowing" he was not a "qualified voter," and here, Veronica was charged with voting when she knew she was not an eligible voter.

---

[5] Both the Revised Civil Statutes and the Penal Code of 1879 can be found at the website of the Texas State Law Library, at http://www.sll.texas.gov/library-resources/collections/historical-texas-statutes-(1879-1925)/.

–21–

Just as the State did not need to prove that Thompson knew the offense was a felony or that he was therefore not qualified to vote (only that he knew he had been convicted of an assault with the intent to commit murder), the State did not need to prove Veronica subjectively knew she was not eligible to vote; it needed only to prove she voted in the March 2010 Dallas County Primary Election when she knew she was not a resident of the precinct for which she was voting. Ignorance of the law is no excuse. *Id.*

The evidence showed Veronica lived in Mesquite, registered to vote using the Douglas Avenue address covered by the JP precinct for which appellant was running, voted in the election as a resident of that precinct, and knew when she registered to vote and when she voted that she was not a resident of Douglas Avenue and did not intend to reside there. Consequently, the State provided evidence beyond a reasonable doubt that Veronica knew the facts making her ineligible to vote, which is all that was required.

But even if we were to conclude to the contrary, there was sufficient evidence from which the trial court could have found beyond a reasonable doubt that Veronica had such subjective knowledge. Although Veronica testified she did not know she was ineligible to vote, the trial court did not have to believe her, particularly in light of her other testimony that she knew she falsely represented on her voter registration application that she lived at the Douglas Avenue address when she did not live there or intend to live there, knew she did not reside there when she voted, knew she was not a resident of the precinct in which appellant ran when she voted, and knew she had to lie on her voter registration card to vote in the election. Moreover, immediately above her signature on her voter registration application was a statement warning her that "giving false information to procure a voter registration is perjury" and a crime under state and federal law. On her early voting form, Veronica affirmed she lived in the precinct and that she "did not deliberately provide false information to secure registration in a precinct in

–22–

which" she did not reside. The evidence shows Veronica knew she had to lie about her residency to vote for appellant, and the trial court could have found, after considering all the circumstances, that Veronica knew she was not eligible to vote in appellant's race. We overrule the sixth issue.

In his seventh issue, appellant contends the evidence is insufficient to prove he knew Veronica was not eligible to vote. He argues "all the evidence" showed that Veronica told her sister, father, and great-uncle she intended to move in with Rolando at the Douglas Avenue address, so there was "no way" for appellant to know her "true intent" or that she would never move.

Initially, we note Veronica testified she did not intend to reside with Rolando and she did not tell anyone she intended to reside with Rolando. Supporting Veronica's testimony regarding her intent were all the documents showing her residence as 2408 Boardwalk in Mesquite. To the extent other witnesses' testimony conflicted with this, it was for the trial court, as factfinder, to resolve the inconsistency.

Moreover, as to appellant's knowledge, the trial court could consider evidence that appellant asked Veronica to change her address so she could vote for him, told her to say she was living on Douglas Avenue if anyone asked, and participated in a meeting at which family members told her how to answer questions at the civil trial and told her to say she lived on Douglas Avenue. Veronica's testimony regarding appellant's part in her illegal voting was circumstantially substantiated by Robert Medrano, who testified that appellant assured him if they would stick together, everything would be okay. Finally, a portion of appellant's grand jury testimony was admitted into evidence. There, appellant testified he knew it would be illegal for Veronica to vote for him if she lived in Mesquite rather than on Douglas Avenue in Dallas. Considering the evidence in the light most favorable to the verdict, we conclude it is sufficient to

establish beyond a reasonable doubt that appellant knew Veronica was not eligible to vote. We overrule the seventh issue.

In his eighth issue, appellant contends the trial court abused its discretion in admitting thirty-seven exhibits as business records. He asserts the records should have been excluded because the State failed to comply with Texas Rule of Evidence 902(10), which requires the records and authenticating affidavits be filed with the clerk of the court at least fourteen days before commencement of trial. *See* TEX. R. EVID. 902(10). He asserts the records and affidavits were filed after trial commenced.

We will not reverse a trial court's decision to admit evidence absent a clear abuse of discretion. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). The trial court abuses its discretion when the decision lies outside the zone of reasonable disagreement. *Id*.

Here, the record shows that on December 29, 2011, appellant and seven family members appeared before the trial court, entered not guilty pleas, and waived their right to a jury trial. Both the State and defense announced ready, and the State called Bloodworth, who testified briefly and provided some evidence against each defendant. The trials were scheduled to reconvene in February, beginning with appellant's trial.

The trial court explained the process being used was to facilitate the scheduling of all the related cases and to "foreclose either the State or defense" from changing their jury elections once verdicts were announced in the early cases. The defense notified the trial court it had filed several discovery motions, and the parties agreed to use the date the trial would reconvene, February 14, as the date it would count back from for discovery deadlines, or January 24, 2012.

On January 23, 24, and 26, 2012, the State filed business records affidavits for the complained-of evidence with the clerk. The evidence included the Facebook conversation between Raquel and Nina. When trial reconvened on February 14, appellant objected that the

State did not file the business records fourteen days before the trial commenced on December 29. The State responded that the "procedures for this whole case relied upon, operated, with today, February 14th, as the first trial date" and that "all the parties acted in December with the right to reserve pretrial issues such as filings, motions, discovery" and "used 20 days from today's date, February 14th, as the deadline for things to be filed, tendered, discussed, followed, et cetera." Further, the State asserted that the "particular procedure" used was to "invoke jeopardy" and was implemented "with the understanding that neither party would be prejudiced."

The trial court agreed with the State, saying that both sides relied on the "unusual" manner in which the trials were started. The trial court stated that the "intent" for all pretrial matters was to use February 14 and "go back 20 days" as the "drop-dead date." In overruling the objection, the trial court explained the case was started for "procedural purposes" on the "Court's wishes" in December, and there were discussions both on and off the record that neither side "would have any problems with regard to complying with statutory mandates because we were going to pick the date of the first trial, which is today, go back 20 days from there. And that was when all of these legal matters must be filed or brought to – whatever the law requires at that point in time."

On appeal, appellant argues any agreement on discovery would not include rule 902(10), which prescribes a procedure for "converting inadmissible hearsay into admissible evidence." Further, he argues the State should have sought an express waiver of the rule's deadline. We cannot agree. After reviewing the record, and the trial court's comments regarding the party's agreement, which was based at least in part on off-the-record discussions, we conclude the trial court did not abuse its discretion in admitting the evidence. We overrule the eighth issue.

We affirm the trial court's judgment.

                          /Molly Francis/

Publish                          MOLLY FRANCIS
TEX. R. APP. P. 47           JUSTICE
120316F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CARLOS MEDRANO, Appellant

No. 05-12-00316-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the 439th Judicial District Court, Rockwall County, Texas
Trial Court Cause No. 2-11-418.
Opinion delivered by Justice Francis;
Justices FitzGerald and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered January 27, 2014

/Molly Francis/

MOLLY FRANCIS
JUSTICE