**AFFIRMED; Opinion Filed November 26, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01268-CR

**L.J. TOLIVER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 195th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-76745-N**

# MEMORANDUM OPINION
Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Lang

Following a plea of not guilty, appellant L.J. Toliver was convicted by a jury of capital murder. Punishment was assessed by the trial court at life imprisonment without the possibility of parole.

In a single issue on appeal, appellant contends "[n]on-accomplice evidence did not tend to connect [appellant] to the victim's capital murder." We decide appellant's issue against him. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL CONTEXT

The indictment in this case alleged that on approximately November 5, 2015, appellant "intentionally cause[d] the death" of Cecil Williams by shooting him with a firearm and "was then

and there in the course of committing and attempting to commit the offense of robbery of said deceased."

At trial, Marcus McCray testified he is a cousin of Williams and they were "very close." Additionally, McCray stated (1) he has known appellant since about 2012 and they were friends "at one point"; (2) appellant and Williams "were close" at one point, but their relationship "became sour" prior to Williams's death; (3) Williams had an "off and on" "relationship" with a woman named Ashley Ware, who also "dated" appellant's cousin Obra London a/k/a "Lil Man"; (4) there was "friction" between Williams and London due to Ware "dating" both of them at the same time; (5) appellant had several "girlfriends," including one in Amarillo named Julie; and (6) appellant's sister Darlene had a boyfriend named Tim Stanfield. Further, according to McCray, (1) Williams and some "partners" were operating a "credit card scam" in which they would "open up business accounts" at Bank of America, "buy information, people's personal information, from a guy overseas," put "these people's information" on credit cards, and use "credit card scanners" they obtained from Bank of America to "continuously swipe these cards" to "put money into these accounts"; (2) appellant was "into the credit card scheme thing" with Williams, but "they had fell out" because appellant claimed Williams owed him some money pursuant to that enterprise and Williams disputed that claim; and (3) Stanfield was involved in the credit card scam "at one point," until Williams "cut him off." Photographs of the individuals described above were introduced into evidence.

McCray testified that on the date of the events in question, he was living at Williams's residence in the Oak Cliff area of Dallas. That residence was within walking distance of a 7-Eleven store. In the early evening on the date in question, McCray and Williams were "just hanging out" at Williams's home with several others, including a friend named Tierra Elder. At some point, McCray was told by Williams that appellant was coming over. McCray was "upset" because he

felt Williams was trying to "make up or mend the situation that couldn't be mended" and Williams "needed to stop being friendly" to appellant.

McCray testified that a short time later, appellant arrived at Williams's home with five others: Ware, a woman known as "Poo," a "girl that was dating Poo," a woman named Kim, and a man McCray had not seen before. McCray stated appellant approached him in the kitchen and asked him "where's my money?" McCray told appellant he had no money. McCray testified he saw Williams and Ware leave the living room together and go into a bedroom. While in the bedroom, Williams and Ware began arguing. According to McCray, (1) Elder went into the bedroom and began physically fighting with Ware; (2) when Elder came out of the bedroom, appellant became agitated with Elder and told Kim to "get her"; (3) Kim "went to draw her pistol" and McCray told Kim he would hit her if she tried to "get any shots off in this house"; (4) appellant then "drew a pistol" on McCray and told McCray "I'll kill you"; (5) Poo jumped in front of McCray and told appellant "no, don't do that"; (6) McCray backed toward the front door and stepped outside onto the front porch; (7) McCray circled around a foosball table on the front porch and appellant followed him with his gun drawn; (8) at that point, appellant shot "three times in the air"; (9) there was "a bunch of commotion" and "[p]eople started running out of the house"; and (10) appellant and the individuals who had arrived with him "jumped in" their vehicles and left. McCray testified the police were called and took photographs of the scene. He stated he then ate some pizza and went to sleep in his bedroom at approximately 11:30 p.m.

McCray testified that sometime later that same night he was awakened by "a bang" and went to see what was going on. He walked into the living room and saw a "kid" in a black hoodie. The "kid" pulled a gun on him and said "where's the money at?" McCray stated he went back into his bedroom and climbed out the window. From the side of the house, McCray saw London standing in front of the house with a gun in his hand, watching the front door. Then, McCray heard

–3–

a woman's scream, followed by a male voice saying "Where's Mark at?" McCray started running and "hit the back fence," then ran toward a nearby church and crouched by the side of that building. At that point, he "happened to look over" and saw Williams "walking in circles" nearby. He saw Williams collapse and "was going to go to him," but then saw Ware and London approach Williams and search his pockets. He stated he heard Ware say "I got the money." After Ware and London left, McCray "ran to [Williams's] aid." He did not see any wounds on Williams, but could not wake him. McCray ran to a nearby DART rail station and asked a police officer for help. He then returned to Williams and stayed with him until paramedics arrived. McCray testified Williams "did not make it" and he later learned Williams had been shot prior to the time he collapsed. Additionally, (1) McCray testified that the items taken from Williams's house during that incident included a laptop computer, cell phones, credit cards, a credit card scanner, and a "scan machine," and (2) on cross-examination, McCray stated he did not see appellant at Williams's house during the second incident described above.

Solomon Basazinew testified he owns the 7-Eleven store near the scene of the incidents described above. He stated that police viewed video recordings made on the date in question by multiple cameras on his property. Portions of those video recordings were played for the jury, including a segment that showed several individuals at the store at approximately 2:35 a.m. on that date.

Ware testified she is "like best friends" with London and knows appellant through London. Further, she stated she was "close" with Williams and "really loved him." According to Ware, on the night in question, she was with appellant at a club when Williams called appellant "wanting us to come over." She stated she told appellant she did not want to go to Williams's house because she knew Elder was there and they "didn't get along." When Ware and the others described above arrived at Williams's house, Ware sat down in the living room. She could hear appellant and

–4–

McCray arguing "over some money" in the kitchen. She testified Williams sat in front of her and "he asked me, am I messing with [appellant], like, am I screwing him or whatever." Ware told Williams no, but he said he did not believe her. He took her to a bedroom and began hitting her. Then, Elder entered the bedroom and started hitting her. Ware testified she began "hitting [Elder] back" and the two of them started fighting. At that point, Ware heard a gunshot in "the front." She stated she grabbed her phone and left the house. Ware testified she, Kim, and appellant got into appellant's rental car and drove away. She asked appellant who had been shooting and he told her it was him. Further, she stated appellant told her "he going to go pick up Lil Man because [Williams] put his hands on me."

According to Ware, (1) after they picked up Lil Man, Stanfield called appellant about "some of the gift cards that they be doing"; (2) appellant told Stanfield "well, I got another situation I want you to handle," which was that Williams "put his hands" on Ware; (3) Stanfield "volunteered his nephews" to "come over there to handle the situation"; (4) Ware, appellant, Kim, and Lil Man "met up with" Stanfield at the 7-Eleven near Williams's house; (5) the five of them drove to a church parking lot nearby, parked appellant's rental car, got into Stanfield's Pontiac SUV, and drove to the home of Stanfield's aunt, where Stanfield's two nephews were waiting outside near their vehicle; (6) Ware saw appellant give Stanfield's nephews "guns and stuff" and heard appellant tell them "get the credit card machines, their phones, and a laptop" and "whatever they do, don't shoot"; and (7) then, the seven of them drove to Williams's house in two separate vehicles. Further, Ware testified that the individuals seen in the 7-Eleven video segment described above were appellant, Stanfield, and Kim.

Ware stated that when they arrived at Williams's home, the gate in the fence surrounding the house was locked. One of Stanfield's nephews took a wooden piece off the fence to make a hole to climb through. According to Ware, she, Kim, and the two nephews climbed through the

hole. Then, Ware and Kim knocked on the front door while the nephews hid on the side of the house. When Williams answered the door, Ware told him she wanted to get the rest of her clothes. Williams did not allow them in, so Ware pushed the door open. Ware stated that when she got inside the house, she (1) saw Elder and began fighting with her; (2) heard a gunshot and saw Lil Man and the nephews running through the house taking things; and (3) then looked out the window and saw Williams outside "hopping" towards the back fence. After the robbery, Ware and the others returned to the home of Stanfield's aunt. Ware stated she took Williams's cell phone from his house, but did not take any money. She stated she later learned Kim had taken some money from Williams and others had taken "the credit card machine and laptop and stuff." Ware and the others transferred those items to appellant's rental car at the church. Then, Ware, appellant, Lil Man, and Kim drove to Amarillo in that vehicle. Ware testified that while they were driving to Amarillo, Stanfield called and told them Williams had died. Ware stated "no one knew he had been shot."

On cross-examination, Ware stated (1) she and others described above left Dallas at about 3 a.m. on the date in question and arrived in Amarillo at approximately 9:00 a.m.; (2) she was arrested in Amarillo on November 21 in connection with the events in question; (3) she told police appellant "was not present" when the murder in question occurred; and (4) she does not know who killed Williams.

Victoria Duncan testified that at the time of the events in question, she was friends with Williams. Approximately two or three weeks prior to the date of the events in question, she traveled with him to Denver. Duncan stated that during that trip, she heard a phone conversation "on speaker" between Williams and appellant in which appellant told Williams "when you come back to Texas, I'm going to kill you."

Further, Duncan testified that on the evening of the events in question, she went to Williams's house with Elder at approximately 11 p.m. Several other people were at the house "just hangin out." She stated Williams spoke to someone on his phone and then "told all of us that [appellant] was coming over." Shortly after that, appellant arrived with Ware, Kim, and several others Duncan did not know. According to Duncan, (1) Williams and Ware were alone in a bedroom when Elder "charged" in; (2) Duncan then heard "fighting" in that bedroom; (3) at some point, Elder and appellant began arguing; (4) appellant told Kim to "get" Elder; (5) Elder and Kim began fighting and were "pulled apart" by others present; (6) Duncan noticed "everybody was going outside" and she then "looked around the corner" and saw appellant shoot a gun "three times in the air" on the front porch; and (7) at that point, appellant and those who had arrived with him were told to leave and the police were called.

Additionally, Duncan testified (1) sometime later, she, Elder, Williams, and several others were in Williams's house "just hanging out" when they heard a loud knock on the front door; (2) when Williams answered the door, Ware pushed it open and Ware, Kim, and two males with guns came in; (3) one of the male intruders "pistol-whipped" Duncan and took her phone; (4) she saw Ware and the two male intruders taking "a whole bunch of stuff" out of the house, including "bank machines, like stuff you swipe credit cards with if you have a bank account"; and (5) she did not see appellant at Williams's house during that incident.

On cross-examination, Duncan testified (1) when appellant shot the gun on the porch during the first incident, he "purposely shot in the air" and it appeared that he did not intend to shoot anybody, and (2) she did not hear a gunshot during the second incident or see Williams get shot.

Daqualyn Davis testified he is seventeen and is a nephew of Stanfield. He stated that on the date of the events in question, he was sitting on the couch at his aunt's house "smoking some

weed" when Stanfield arrived. Stanfield told Davis and Davis's older brother to step outside because "we're about to go move some clothes." Davis understood that to mean they were going to commit a robbery. Outside the house was a vehicle that contained four people Davis had not met: appellant, Lil Man, and two females. Davis stated appellant gave guns to him and Lil Man. Stanfield told them "we're not going to kill nobody." Then, the group headed to Williams's house in two vehicles. Davis, his brother, and Lil Man rode in one vehicle and Stanfield, appellant, and the two females rode in the other. Davis testified he and his brother were told to steal a credit card machine and scanner and were promised $20,000.

Davis stated that upon arrival at Williams's house, all of them, including appellant, exited the vehicles. According to Davis, appellant and Stanfield remained standing outside the fence while the other four went through the hole as described above. Further, Davis testified (1) after the front door was pushed open, the two females ran in and started "beating up somebody"; (2) Williams "came running out" and tried to "get past" Lil Man, who was "blocking the entrance"; (3) "once [Williams] had did that, the gunshot went off" and Williams "jumped," then looked at Davis and said "help"; (4) Lil Man, Davis, and Davis's brother then went into the house; (5) Stanfield and appellant subsequently came into the house for several minutes during the robbery; and (6) Lil Man later stated he had killed Williams.

Officer Johnny Fitzgerald of the Dallas Police Department testified that at 12:50 a.m. on the date in question, he responded to a 9-1-1 call respecting gunshots at Williams's residence. Fitzgerald spoke with Williams and determined there had been a party going on that was "disturbed by someone shooting a gun." At approximately 3:20 a.m., another 9-1-1 call came from the same location and Fitzgerald responded. According to Fitzgerald, this time "someone had been shot." He stated he saw a "young lady" outside the house next door who was crying and "in fear for her life." He testified that woman told him "LJ and them" "came back to the location."

–8–

LaQuisha Rose testified that at the time of the events in question, she was acquainted with both Williams and appellant. She stated she was introduced to them on separate occasions through Williams's cousin Demarco Jones, who was a friend of hers. Sometime in 2015 prior to the date of the shooting in question, she attended a get-together in East Dallas at which she heard a conversation between Jones and appellant. According to Rose, appellant told Jones "he was going to shoot up [Williams's] house" and "tell nobody to be over there." She stated she thought appellant "was being serious." Further, Rose testified she was at Williams's house during the events in question described above.

Deputy Logan Walker of the United States Marshal Service testified that on November 19, 2015, he arrested appellant in Amarillo. According to Walker, items found in appellant's vehicle and on his person at that time included (1) several MoneyGram receipts respecting money sent to or from India, Pakistan, and the Amarillo home of Glenda Jewel Brisco; (2) a "scanner"; (3) five new iPhones; (4) several stacks of credit and debit cards bound by rubber bands; and (5) a business card of a Bank of America "small business" personal banker with a Denver, Colorado address.

After the State rested its case, Brisco testified for the defense. Brisco stated she is a friend of appellant and lived in Amarillo at the time of the events described above. According to Brisco, (1) on the date in question, she was getting ready to leave for work when appellant arrived at her home "out of the blue" between 7:30 and 7:45 a.m.; (2) appellant was alone at that time and Ware and London arrived several days later; (3) the drive from Dallas to Amarillo takes six and one-half to seven hours; and (4) if an individual reached Amarillo at 7:30 a.m., the latest that individual could have left Dallas would have been 1:00 a.m.

Following the verdict and assessment of punishment described above, this appeal was timely filed.

## II. CORROBORATION OF ACCOMPLICE-WITNESS TESTIMONY

### *A. Standard of Review and Applicable Law*

Under Texas Code of Criminal Procedure article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is sufficiently corroborated by other, non-accomplice evidence. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005)). A challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.). To corroborate accomplice-witness testimony, "[a]ll the law requires is that there be some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997)); *see* CODE CRIM. PROC. art. 38.14.

Corroboration is not sufficient if it merely shows the offense was committed. CODE CRIM. PROC. art. 38.14; *Smith*, 332 S.W.3d at 439. To determine the sufficiency of the corroboration, we eliminate the testimony of the accomplice and examine the remaining portions of the record to see if there is any evidence that tends to connect the accused to the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007); *Medrano v. State*, 421 S.W.3d 869, 883 (Tex. App.—Dallas 2014, pet. ref'd). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith*, 332 S.W.3d at 442; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes, but rather each case must be judged on its own facts. *Malone*, 253 S.W.3d at 257 (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)); *see also Cantelon*, 85 S.W.3d at 461 (the "tends to connect" standard is not a high standard). Corroborating evidence may be direct or circumstantial and need not be sufficient by itself to establish the

defendant's guilt. *Smith*, 332 S.W.3d at 442. "Even 'apparently insignificant incriminating circumstances' may provide sufficient corroboration." *Medrano*, 421 S.W.3d at 883 (quoting *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)). Further, "when there are conflicting views of the evidence—one that tends to connect the accused to the offense and on that does not—we will defer to the factfinder's resolution of the evidence." *Smith*, 332 S.W.3d at 442.

Evidence that the defendant was in the company of the accomplice at or near the time or place of the crime is not, alone, conclusive corroboration. *Hernandez*, 939 S.W.2d at 178. However, proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993). Additionally, motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime. *Smith*, 332 S.W.3d at 442. Other suspicious conduct of the defendant includes actions indicating the defendant's consciousness of guilt. *See Simmons v. State*, 282 S.W.3d 504, 510 (Tex. Crim. App. 2009).

### B. Application of Law to Facts

In his sole issue on appeal, appellant contends "non-accomplice evidence did not tend to connect [appellant] to the victim's capital murder." Specifically, appellant asserts (1) "the State relied on non-accomplice evidence showing [appellant's] presence at the first altercation, and at a nearby 7-Eleven with the accomplices approximately 45 minutes before the second altercation"; (2) "even had non-accomplice evidence put [appellant] with the accomplices at the time of the offense, there still must be some further evidence which tends to connect the accused to the commission of the crime" and "no such additional evidence exists"; and (3) appellant "presented

evidence that he had left for Amarillo after the first altercation and a State's witness testified that, during the first altercation, it was apparent that [appellant] did not intend to shoot anybody."

The State responds in part (1) appellant's argument "overlooks the inculpatory circumstances presented through non-accomplice evidence that corroborate the accomplice testimony connecting [appellant] to the offense" and (2) "[s]uch corroboration was sufficient for the jury's determination of guilt."

As described above, the record shows non-accomplice testimony that appellant (1) was present at the first altercation; (2) was present at the 7-Eleven near Williams's home at approximately 2:35 a.m. on the date in question with Stanfield and Kim; (3) was "into the credit card scheme thing" with Williams, but "they had fell out" because appellant claimed Williams owed him some money pursuant to that enterprise and Williams disputed that claim; and (4) made death threats toward Williams several weeks prior to the events in question. Additionally, (1) although Brisco testified appellant arrived in Amarillo at a time that was inconsistent with him being in Dallas past 1:00 a.m. on the night in question, her testimony and that of Walker show appellant left Dallas for Amarillo on the date in question and was in Amarillo several weeks later, and (2) the items described by McCray and Duncan as having been taken in the robbery included credit cards and "stuff you swipe credit cards with." On this record, we conclude there is "some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Hernandez*, 939 S.W.2d at 178; *see Smith*, 332 S.W.3d at 439, 442. Therefore, we conclude the accomplice-witness testimony in question was sufficiently corroborated. *See Smith*, 332 S.W.3d at 442 (suspicious circumstances can include motive and opportunity); *Simmons*, 282 S.W.3d at 510 (suspicious circumstances can include consciousness of guilt); *see also Fisher v. State*, No. 09-11-00379-CR, 2012 WL 5450828, at *12 (Tex. App.—Beaumont Nov. 7, 2012, no pet.) (mem. op., not designated for publication) (evidence that defendant was in location of robbery near time

it occurred and non-accomplice witness had previously heard defendant discuss intention to commit crime was sufficient to corroborate accomplice-witness testimony).

We decide appellant's issue against him.

### III. CONCLUSION

We decide against appellant on his sole issue. The trial court's judgment is affirmed.


/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE


Do Not Publish
TEX. R. APP. P. 47.2(b)
171268F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

L.J. TOLIVER, Appellant

No. 05-17-01268-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F15-76745-N.
Opinion delivered by Justice Lang, Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of November, 2018.