

# NUMBER 13-17-00112-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EDUARDO LUNA RODRIGUEZ,                                  **Appellant,**

**v.**

THE STATE OF TEXAS,                                           **Appellee.**

### On appeal from the 107th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Hinojosa
### Memorandum Opinion by Justice Hinojosa

Appellant Eduardo Luna Rodriguez appeals from a judgment convicting him of one count of capital murder by committing murder in the course of retaliation, *see* TEX. PENAL CODE ANN. §§ 19.03(a)(2), 36.06(a)(1) (West, Westlaw through 2017 1st C.S.), a capital felony, and one count of engaging in organized criminal activity by possessing with intent to distribute a controlled substance in an amount greater than 400 grams, *see id.*

§ 71.02(a) (West, Westlaw through 2017 1st C.S.), a first-degree felony, and sentencing him to imprisonment for life without parole and fifty years, respectively. In six issues, which we reorder, Eduardo[1] complains that: (1) there is insufficient non-accomplice witness testimony to corroborate an accomplice witness's testimony; (2-3) the trial court abused its discretion by overruling his objections and granting the State leave to amend its expert disclosure and call a previously undisclosed expert and a lay witness whose names were not included in the State's pretrial witness list; (4-5) the trial court abused its discretion by denying his motion for continuance to investigate and determine the need to hire defensive experts following the trial court's overruling of objections lodged in relation to Eduardo's second and third issues; and (6) cumulative error necessitates reversal. We affirm.

## I. BACKGROUND

According to the indictment, on March 10, 2015, Eduardo, Eduardo's older brother Fernando Luna Rodriguez, Eduardo's eldest brother Joel Luna, Aaron Rodriguez Medellin, and Nestor Manuel Leal, shot Jose Francisco Palacios-Paz dead because the group believed that Palacios-Paz was going to inform law enforcement authorities about the group's narcotics smuggling and selling activities. All five individuals were indicted on, among other things, one count of capital murder and one count of engaging in organized criminal activity by possessing with intent to distribute a controlled substance in an amount greater than 400 grams. Before trial, Fernando entered into a plea agreement with the State wherein it recommended that Fernando be sentenced to ten

---

[1] We will refer to appellant by his first name because he shares a surname with several witnesses.

2

years' community supervision in exchange for his testimony.

## A. Fernando's Testimony

At trial, Fernando recounted his and his brothers' narcotics trafficking activity in the years preceding Palacios-Paz's death. Toward the beginning of this period, Fernando lived and worked in Reynosa, a city on the Mexican side of the United States–Mexico border. Fernando recalled receiving approximately two hundred and fifty thousand dollars in U.S. currency, a kilo of cocaine, and a pistol. The pistol was inscribed with the words "Parado," which according to Fernando means "bird" and is Eduardo's nickname; "puma commandate;" and "Cartel de Gulfo." The pistol's handgrips depicted Saint Jude. Fernando, who worked for a Mexican oil and gas company in Reynosa, stored these items in his work locker.

Over time, Fernando brought the money, cocaine, and pistol into the United States. He gave the cocaine to Aaron and Nestor in small batches and admitted to seeing them sell it on at least one occasion. Meanwhile, Eduardo acquired Veterans Tire Shop in Edinburg, Texas; Palacios-Paz worked at the tire shop. Joel purchased a house in San Juan, Texas. In 2015, Eduardo purchased a large safe and placed it in Joel's house.

On March 9, 2015, Fernando received a text message from Palacios-Paz's girlfriend indicating that Palacios-Paz was going to inform law enforcement authorities about the group's drug smuggling and selling activities. He forwarded the messages to Eduardo. Eduardo texted back to Fernando, "you are going to see, this is it." Eduardo's text message lead Fernando to believe that Eduardo was going to act against Palacios-Paz. The following day at approximately 7:00 p.m., Palacios-Paz was watching a video

3

on his cellphone in the office at the tire shop as Fernando sat near him. Eduardo then entered the office, shot Palacios-Paz in the head with the decorated pistol Fernando had brought into the United States, and exited the room. On Eduardo's orders, Aaron and Nestor wrapped Palacios-Paz's body in a rug and placed it in the bed of Eduardo's pickup truck. After Eduardo drove away from the tire shop, he informed Fernando over a cellphone conversation that he intended to dispose of Palacios-Paz's body at a fishing spot on South Padre Island, Texas.

## B.      Other Witnesses' Testimony

On March 16, 2015, a headless body was reported to be floating in the Laguna Madre. Jose Chapa, a special agent with the Department of Homeland Security, was asked by law enforcement officials to identify the body by comparing its fingerprints to those in an immigration database. Chapa's comparison identified the body as that of Palacios-Paz, a Honduran native who had recently been deported.

Elizabeth Miller, M.D., a forensic pathologist, performed an autopsy on Palacios-Paz's decapitated body. Miller observed that, in addition to being decapitated, Palacios-Paz's body sustained a vertical incision that extended from just above the pelvic bone up through the right side of the chest. She concluded that the cause of Palacios-Paz's death was homicidal violence.

Jennifer Smith, a senior forensic analyst, compared DNA samples taken from Palacios-Paz's body with four blood samples collected from the tire shop. Two of the blood samples from the tire shop matched Palacios-Paz's DNA.

4

Marla Flores, an intelligence analyst for the Unified Narcotics Intelligence Task Force in the Cameron County District Attorney's Office, extracted text messages, call logs, and location information for the cellphones of, among others, Eduardo, Joel, and Fernando. Flores was also able to extract text messages that were deleted by the cellphone's user. According to Flores, beginning at 6:24 p.m. on March 9, 2015, Fernando sent Eduardo text messages. Flores read those messages, which were in Spanish, and, as translated by the court interpreter, the messages stated: "Hello, good evening. Now Franky is saying that—and his brother sell drugs and that in any—And that at any moment, he is going to put the finger on him." Using data from cellphone tower pings made whenever Eduardo's cellphone made or received a call, Flores determined that, on March 10, 2015, Eduardo's cellphone was in Edinburg between 11:27 a.m. and at least 3:38 p.m. At 7:34 p.m., Eduardo's cellphone made an outgoing call that was relayed from a cellphone tower in the McAllen, Texas area. Throughout the remainder of the evening, Eduardo's cellphone continued to receive incoming and make outgoing calls along U.S. Highway 83 while traveling eastward toward the Laguna Madre. The final calls for Eduardo's cellphone on March 10, 2015 pinged off of cellphone towers along the Laguna Madre during the 11:00 p.m. hour.

Patrick O'Connor, a Texas Ranger, assisted with the investigation into Palacios-Paz's death. As part of O'Connor's investigation, he executed a search warrant on Joel's house in San Juan. A safe inside the house was retrieved and opened. It contained, among other things, the following: (1) the decorated gun described by Fernando; (2) a black case containing a white powdery substance later identified as cocaine with trace

amounts of methamphetamine; (3) license plates from the Mexican state of Tamaulipas; (4) a ledger containing notes regarding weapons and money; (5) ninety thousand dollars in U.S. currency; (6) baggies, measuring spoons, and a digital scale; and (7) a yellow envelope. O'Connor opined that foreign license plates may be used to hinder an investigation because U.S. law enforcement authorities have no way of ascertaining the vehicle's registration. O'Connor further opined that the baggies, measuring spoons, and digital scale were used to repackage and sell drugs based on their proximity to the cocaine.

Carlos Vela, a forensic analyst with the Texas Department of Public Safety, analyzed the contents of the safe for fingerprints. He determined that the yellow envelope inside the safe contained Eduardo's thumb print.

## C. Jury Charge, Verdict, and Judgment

The jury charge instructed the jury that Fernando was an accomplice as a matter of law. The jury was also instructed that it could not find Eduardo guilty unless it first believed Fernando's testimony and then found that Fernando's testimony was corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West, Westlaw through 2017 1st C.S.).

The jury found Eduardo guilty of one count of capital murder by committing murder in the course of retaliation, *see* TEX. PENAL CODE ANN. §§ 19.03(a)(2), 36.06(a)(1), and one count of engaging in organized criminal activity by possessing with intent to distribute

6

a controlled substance in an amount greater than 400 grams. *See id.* § 71.02(a). The trial court assessed punishment at imprisonment for life without parole and fifty years for each respective count. It signed a judgment in accordance with the jury's verdict and its assessment of punishment. This appeal followed.

## II. DISCUSSION

We address Eduardo's appellate issues in their reordered sequence.

### A. Corroboration of Accomplice-Witness Testimony

By Eduardo's first issue, he contends that the State failed to present sufficient non-accomplice corroborating evidence to connect him to the alleged commission of the offenses of capital murder by retaliation and engaging in organized criminal activity.

#### 1. Standard of Review and Applicable Law

Under Texas Code of Criminal Procedure article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is sufficiently corroborated by other, non-accomplice evidence. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 38.14). A challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.). To corroborate accomplice-witness testimony, such as that of Fernando, "[a]ll the law requires is that there be some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14.

7

Corroboration is not sufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith*, 332 S.W.3d at 439. To determine the sufficiency of the corroboration, we eliminate the testimony of the accomplice and examine the remaining portions of the record to see if there is any evidence that tends to connect the accused to the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007); *Medrano v. State*, 421 S.W.3d 869, 883 (Tex. App.—Dallas 2014, pet. ref'd). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith*, 332 S.W.3d at 442; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes, but rather each case must be judged on its own facts. *Malone*, 253 S.W.3d at 257 (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)); *see also Cantelon*, 85 S.W.3d at 461 (explaining that the "tends to connect" standard is not a high standard). Corroborating evidence may be direct or circumstantial and need not be sufficient by itself to establish the defendant's guilt. *Smith*, 332 S.W.3d at 442. "Even 'apparently insignificant incriminating circumstances' may provide sufficient corroboration." *Medrano*, 421 S.W.3d at 883 (quoting *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)). Further, "when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith*, 332 S.W.3d at 442.

8

Evidence that the defendant was in the company of the accomplice at or near the time or place of the crime is not, alone, conclusive corroboration. *Hernandez*, 939 S.W.2d at 178. However, proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993). Additionally, motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime. *Smith*, 332 S.W.3d at 442. Other suspicious conduct of the defendant includes actions indicating the defendant's consciousness of guilt. *See Simmons v. State*, 282 S.W.3d 504, 510 (Tex. Crim. App. 2009).

### 2. Analysis

As described above, the record contains non-accomplice witness testimony relating to Palacio-Paz's death and the controlled substance found in the safe. Smith testified that two of the blood samples from Eduardo's tire shop matched Palacios-Paz's DNA. Flores recounted text messages that Eduardo's cellphone received from Fernando's cellphone which provided that Palacio-Paz was prepared to implicate Eduardo in narcotics trafficking. *Smith*, 332 S.W.3d at 442 (providing that motive and opportunity evidence may be considered in connection with other evidence that tends to connect the accused to the crime). Moreover, using the pings from Eduardo's cellphone for incoming and outgoing phone calls, Flores testified that Eduardo's cellphone travelled

9

from Edinburg toward the Laguna Madre on March 10, 2015. Flores's forensic analysis of Eduardo's cellphone data corroborates Fernando's testimony regarding Eduardo's involvement in Palacio-Paz's murder and disposal of the body. As for evidence relating to Eduardo's involvement with possession of a controlled substance, Vela testified that a yellow envelope inside the safe contained Eduardo's thumb print. Lastly, O'Connor opined that the baggies, measuring spoons, and a digital scale—located in the safe Eduardo purchased and which contained the envelope with Eduardo's thumb print—were used to repackage and sell drugs, based on their proximity to the cocaine.

On this record, we conclude there is "some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Hernandez*, 939 S.W.2d at 178; *see Smith*, 332 S.W.3d at 439, 442. Therefore, we conclude the accomplice-witness testimony in question was sufficiently corroborated. *See Smith*, 332 S.W.3d at 442.

We overrule Eduardo's first issue.

**B.     Smith's and Chapa's Testimony**

By Eduardo's second issue, he contends that the trial court abused its discretion in granting the State leave to amend its expert designation to include Smith. Eduardo's third issue contends that the trial court abused its discretion by allowing Chapa, whom Eduardo contends was a lay witness but concedes may also have been classified as an expert, to testify.

**1.     Standard of Review and Applicable Law**

Upon request, the State is required to provide notice of any expert witnesses it

10

intends to call at trial. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b) (West, Westlaw through 2017 1st C.S.).[2] If the trial court allows a witness who was not on the State's list to testify, we review that decision for an abuse of discretion. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993); *Hamann v. State*, 428 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Depena v. State*, 148 S.W.3d 461, 465 (Tex. App.—Corpus Christi 2004, no pet.). In our review, we consider two factors: (1) whether the State's actions in calling a previously undisclosed witness constituted bad faith, and (2) whether the defendant could have reasonably anticipated that the witness would testify. *Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000) (citing *Nobles v. State*, 843 S.W.2d 503, 514–15 (Tex. Crim. App. 1992)); *Hamann*, 428 S.W.3d at 228.

**2.    Analysis**

At the final pretrial hearing, counsel for the State and Eduardo argued over the State's disclosure of expert witnesses. The arguments of counsel provide the following:

[EDUARDO'S COUNSEL 1]:    Your Honor, on September 28th, 2016, the State filed its notice of expert witnesses. In that notice—what is her name again, I'm sorry.

[PROSECUTOR]:    Jennifer Smith.

[EDUARDO'S COUNSEL 1]:    Ms. Smith was never disclosed.

[EDUARDO'S COUNSEL 2]:    We have the notices to the Court.

[EDUARDO'S COUNSEL 1]:    We have the notice, Your Honor.

---

[2] The trial was governed by an earlier version of the Texas Code of Criminal Procedure, which required a ruling from the trial court before the State had to produce the response. *See* Act of Jun. 15, 2015, 84th Leg., Ch. 459, 2015 TEX. GEN. LAWS 1774 (amending article 39.14(b) to eliminate the need for a court order). The record contains no such order. However, from the arguments of counsel to the trial court, it appears that the State responded to the request without awaiting an order from the trial court. Accordingly, the distinction between the different versions of the statute is not relevant in this case. We will refer to the current statute for ease of reference.

| | |
|---|---|
| [PROSECUTOR]: | We would ask to amend our notice, Judge. Jennifer Smith was the private Lab Corps which was noted and discussed in the supplemental reports by the investigators that investigated this case since before June of '15. |
| [EDUARDO'S COUNSEL 1]: | However, Your Honor, the rules are very clear, they must be disclosed prior to trial, and I will look at the rule, but the morning of trial is not the time to disclose witnesses, Your Honor. We will be asking that she be stricken. |
| [COURT]: | And she [is] an expert on what? |
| [PROSECUTOR]: | The DNA. |
| [COURT]: | DNA? |
| [PROSECUTOR]: | DNA. And she was disclosed in a subpoena list long before this setting. I believe the subpoena list for this case has been filed, and I expect her name would be in the last subpoena list. |
| [EDUARDO'S COUNSEL 2]: | Your Honor— |
| [EDUARDO'S COUNSEL 1]: | Again, Your Honor, that's why we filed our request. That's why there are rules of evidence. That's why we always abide and play by them. And because she was not disclosed, Your Honor, we are going to be asking that you—that she be stricken. |
| [COURT]: | All right. The Motion to Strike will be denied. The Court will grant the Motion to Amend the Expert List. |
| [EDUARDO'S COUNSEL 1]: | Your Honor, and I will reurge my motion, Your Honor, pursuant to Article 39.14 of the Texas Code of Criminal Procedure, Rules of Evidence 702, 703 and 705, Your Honor, it is required that it be disclosed, not be disclosed right before we pick a jury, because we would not have been afforded the opportunity to properly, to properly |

12

prepare for this trial. That's why the witnesses, expert witnesses must be disclosed in order for us to determine whether we need to retain our own witnesses to review their reports or what they will be testifying to, Your Honor. And they didn't. They do it right now. What opportunity do we have on behalf of my client to adequately prepare for his defense if that expert was not disclosed?

[PROSECUTOR]: There is no surprise on this case, Judge. Counsel has been provided all the discovery we have had, they have had the supplements from Texas Ranger Patrick O'Connor, from Sergeant—

[COURT]: Okay. Well, I don't care about them on this witness, was there a report generated by her?

[PROSECUTOR]: Yes, and it's in the file. It's been disclosed to them.

[COURT]: Okay.

[PROSECUTOR]: It was part of the discovery.

[EDUARDO'S COUNSEL 1]: Well, but then again, Your Honor, the rules don't say you provide a report. The rules are and the law is that that is why they must put it in writing and disclose their experts, because they rely sometimes on other experts to testify from another expert's report. That's why we have to request that they list who they will be calling, not just substitute Nilly-Willie [sic] at the time of trial. How am I going to know—see, I didn't even know her name until right now. How am I going to know how to adequately prepare. I didn't know her name, how I am going go look to see whether this expert has ever been sanctioned, has ever been disqualified as an expert? I obviously don't have the time to do it now, we are going to be selecting a jury. That's why we have the Rules of Evidence, and the request. And I filed my Motion for Discovery since

13

|                   |                                                                                                                                                                                                                                                                                                                                                                                                                                                              |
|-------------------|------------------|
| [PROSECUTOR]:     | October of 2016. I didn't file it last week. I didn't file it last month. I filed it three months ago. And for them to come in this morning and tell us who it is, it's not fair play. And not only that, Your Honor, my client's due process has been violated and has continued to be violated if the Court grants them leave of court to amend their disclosure of experts. And it is not fair play and it is against the rights and due process of my client. |
| [PROSECUTOR]:     | Judge, counsel has been aware of the Sheriff's Department seeking a private lab early on in this investigation to test the blood that was collected from the Veterans Tire Shop to connect it to this homicide. That has been clearly made known to counsel. There was a lab return that matched the victim's blood, Franky Palacios Paz, as drawn from his corpse and compared to the blood collected from the Veterans Tire. That was done by Lab Corps, by this individual, Jennifer Smith. That report has been provided to counsel long ago, Judge. There is no secret. There no surprise, okay? Now, they want it in writing, I'll do it in writing right now, we are still prior to trial, trial hasn't started. |
| [COURT]:          | I already granted the Motion to Amend. |

As for Smith's testimony, the State's appellate brief aptly notes, as it did in the trial court, that Smith's report was provided to Eduardo's counsel before trial and that Eduardo's counsel could have reasonably anticipated that Smith would testify. The State also posits that there is no evidence of bad faith on its part. In light of the record before us, we cannot say that the trial court abused its discretion in granting the State leave to amend its expert disclosure and overruling Eduardo's objection to Smith being called as a witness by the State. *See Wood*, 18 S.W.3d at 649.

14

As for Chapa's testimony, Eduardo's appellate brief contends that the "trial court abused its discretion when it permitted the State to call witness Chapa because the prosecution never placed him on their trial witness list and he remained unknown to the defense until the moment he was called to the stand." Eduardo fails to direct us to any portion in the record wherein he objected to Chapa being called to testify by the State. *See* TEX. R. APP. P. 33.1. Assuming Eduardo preserved the error he now complains of, we cannot conclude that the trial court abused its discretion in permitting Chapa to testify. The State's appellate brief notes that Chapa's identification of Palacio-Paz's fingerprints was included in O'Connor's supplemental report, which was disclosed to Eduardo's counsel. Thus, just as with Smith, Eduardo's counsel could have reasonably anticipated that Chapa would testify. *See id.* Moreover, Eduardo fails to direct us to any evidence relating to bad faith on the State's part. *See id.*

We overrule Eduardo's second and third issues.[3]

## C.    Cumulative Error

By his sixth issue, Eduardo argues that his conviction should be reversed because of the cumulative error. Multiple errors may be found to be harmful in their cumulative effect even if each error considered separately would be harmless. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311

---

[3] We need not address Eduardo's fourth and fifth issues in light of our disposition of his second and third issues. *See* TEX. R. APP. P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as practicable but that address every issue raised and necessary to final disposition of the appeal).

(Tex. Crim. App. 2010).   Moreover, if an individual's claims of error lack merit, then there is no possibility of cumulative error.   *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).   Eduardo has not demonstrated any trial court error from which we could consider cumulative harm.

We overrule Eduardo's sixth issue.

### III. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
24th day of January, 2019.