**AFFIRMED and Opinion Filed August 23, 2023**



In The

### Court of Appeals
### Fifth District of Texas at Dallas

### No. 05-21-00855-CR

### AARON RAYSHAN WELLS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the Criminal District Court No. 4
### Dallas County, Texas
### Trial Court Cause No. F19-75986

## OPINION

Before Justices Reichek and Goldstein[1]
Opinion by Justice Reichek

Aaron Rayshan Wells appeals his conviction for capital murder. Bringing six issues, appellant contends (1) he was not brought to trial timely under the Interstate Agreed Detainer Act (IADA), (2) the trial court abused its discretion in denying his motion to suppress evidence obtained through a geofence warrant, (3) the State failed to show the Google data used as a basis for its expert's testimony was reliable, (4) the trial court abused its discretion in denying his motion for continuance, (5) the

---

[1] Justice David Schenck was a member of the original panel, but Justice Schenck is no longer a member of the Court, and he did not participate in the issuance of this opinion.

evidence was legally insufficient to support his conviction, and (6) the submission of a jury instruction on conspirator liability constituted harmful error. We affirm the trial court's judgment.

## Background

We begin with a brief overview of the facts concerning the offense and investigation. In the early morning hours of June 24, 2018, Nikita Dickerson engaged in her nightly routine of meeting her boyfriend, Jimmy Giddings, in the driveway of their house to escort him inside. Giddings was a drug dealer, and Dickerson brought a gun with her for their protection. Dickerson stated she was not aware of any particular threats to Giddings, but the neighborhood was unsafe.

On this occasion, as Giddings was getting out of his car, a group of men rushed toward him from the vicinity of a church across the street. One of the men shot at Dickerson multiple times, and she sustained non-fatal injuries. As Dickerson collapsed to the ground, she dropped her gun, which was picked up by the man who shot her. Security camera recordings show Giddings running into the house and closing a metal gate in the entryway behind him. The men followed, kicking open the gate to gain entry. Three men are clearly visible in the recording with the lower parts of their faces covered. The men entered the house, forcing Dickerson to get up and walk inside with them at gunpoint. A short time later, a fourth man, later identified as appellant, ran past the camera into the house.

Once in the house, the men demanded money. During the course of the robbery, Giddings was shot and killed. One of Dickerson's children, who was in a bedroom of the house during the offense, called 911. The men fled before police arrived.

A homicide detective, Jeffrey Loeb, released still pictures of the three men who could be seen clearly in the security camera footage. A public tip line was opened to try to identify them. Although the lower portions of the men's faces were covered, the pictures showed distinctive tattoos.

When no productive leads were generated by the tip line, Detective Loeb requested a geofence search warrant to obtain information from Google about cellular devices located in the area at the time of the offense. Based on the security camera recording timestamp and footage showing that the men were in the area of the church immediately before and after the offense, Loeb obtained a warrant to search Google's records for information on devices located within a rectangular geofence encompassing Giddings's house and the portion of the church directly across the street between 2:45 a.m. and 3:10 a.m. on June 24. Ultimately, a cellular phone associated with appellant was identified as being at the scene. Through appellant's phone records and a search of social media, police were able to identify Milton Prentice, Brian Groom, and Kiante Watkins as the other three men involved in the offense.

Appellant was found incarcerated for a different offense in a federal prison in Tennessee. After being transferred to Dallas County, he was tried for and convicted of capital murder. This appeal followed.

**Analysis**

**I. IADA**

In his first issue, appellant contends the trial court erred in denying his motion to dismiss under the IADA because the State of Texas failed to bring him to trial within 180 days after he requested disposition of his case. The IADA is a congressionally sanctioned compact between the United States and the states that have adopted it, including Texas. *See Kirvin v. State*, 394 S.W.3d 550, 555 (Tex. App.—Dallas 2011, no pet.). The Act outlines a cooperative procedure to be used when a state is seeking to try a prisoner who is being held in a penal or correctional institution of another state. *See* TEX. CODE CRIM. PROC. ANN. art. 51.14. The state with the untried indictment, information, or complaint must file a detainer with the institution that is holding the prisoner. *State v. Votta*, 299 S.W.3d 130, 135 (Tex. Crim. App. 2009).[2] The institution must then promptly inform the prisoner the detainer has been filed and that he has the right to request final disposition of the charges made the subject of the detainer. *Id*. The prisoner may make such a request

_____

[2] A detainer is a request that is filed by a criminal justice agency with the institution in which the prisoner is incarcerated asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's release is imminent. *Id*. at 135, n. 5.

–4–

by giving written notice to the warden of the facility in which he is being held who is then required to forward the request to the appropriate court and prosecuting officer. *Id.* Once the request for final disposition has been received by the court and prosecuting officer, the prisoner must be brought to trial within 180 days unless a continuance is granted under the Act. *Id.*

A continuance granted under the Act must be (1) by a court of competent jurisdiction, (2) in open court, (3) with the defendant or his counsel present, (4) for good cause, and (5) be necessary or reasonable. *Kirvin*, 394 S.W.3d at 556. The "open court" requirement does not mandate a formal proceeding, but is intended to prevent ex parte or sua sponte continuances. *Id.* Where a continuance is agreed to by both sides, it is deemed to be reasonable, necessary, and granted for good cause. *Id.* at 556–57. The defendant's personal consent to the continuance is not required; his counsel's signature is sufficient. *Id.* at 556. Agreed continuances toll the statutory period within which the defendant must be tried. *Id.*

The record in this case shows the State of Texas filed its detainer with the Tennessee prison and, on April 8, 2020, appellant signed his request for final disposition. Appellant's request was received by the trial court on May 8. The State asserts the district attorney did not receive the disposition request until May 29. Appellant was transferred to a Dallas County jail on June 30.

On July 15 and August 7, both the district attorney and appellant's defense counsel signed agreed requests for continuance, otherwise known as "pass slips,"

–5–

resulting in a trial setting in September. On September 23, the parties filed a joint motion for continuance stating that, although the IADA required appellant to be tried within 180 days, the postponement of jury trials due to the pandemic constituted good cause to continue the trial date in this case. Based on the joint motion, the trial court reset the trial date to March 1, 2021.

Between February 11, 2021 and April 15, 2021, the district attorney and defense counsel jointly requested five more continuances resulting in a trial setting of August 19. On June 25, the court conducted a pre-trial conference at which the State, appellant, and his counsel appeared. The State announced at the hearing that it was ready to proceed to trial. Defense counsel, however, stated she had a conflict and requested the trial be moved to the next available date on the court's jury calendar, which was September 21.

Appellant spoke on his own behalf and stated he had two concerns. His first concern was that he felt there had been a lack of communication between him and his counsel, resulting in her failure to file motions or "come up with a defense" despite the fact the case was set for trial. Because of this, appellant requested he be appointed new counsel. Appellant's second concern was the delay in his case going to trial, and he requested the charges against him be dismissed under the IADA.

The trial court denied appellant's request for new counsel and appellant does not challenge the denial on appeal or assert he received ineffective assistance. In response to appellant's IADA complaint, the court agreed appellant "certainly

–6–

need[ed] to have this case tried." The court went on to find good cause existed to extend the trial date to September 21, but cautioned that it would be the final continuance granted. Jury selection began on September 21, and trial commenced on September 23.

As stated above, agreed continuances toll the statutory period within which a defendant must be brought to trial under the IADA. *Id*. at 557. The record here shows the State and defense agreed to multiple continuances of the trial date covering a period of 379 days between July 15, 2020 and August 19, 2021. During a large portion of this time, jury trials were not being conducted due to the global pandemic. Defense counsel then requested an additional continuance which tolled the statutory period for a further 35 days. *See id*. at 556 (reasonable delays caused by defense motions toll statutory period). Appellant's trial commenced 482 days after his request for disposition was received by the district attorney and 503 days after his request was received by the trial court. Even assuming the latter date controls, 414 of the 503 days were tolled, meaning that only 89 days of the 180-day period ran from the date of the request to the beginning of trial. Appellant's trial was, therefore, timely under the IADA. *Id*. at 558. We resolve appellant's first issue against him.

## II. Geofence Search

In his second issue, appellant contends the trial court abused its discretion in refusing to suppress location history data obtained from Google with a geofence

search warrant. A geofence warrant allows police investigators to search location history data for compatible mobile devices located within a specified area during a specified period of time. *In re Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 351 (N.D. Ill. 2020) ("*Arson*"). This type of warrant is essentially the reverse of a global positioning systems ("GPS") warrant which allows a search of location data generated by a specific device belonging to a person known or suspected to have been involved in criminal activity. *See In re Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 69 (D.D.C. 2021) ("*D.C. Google I*"). With a geofence warrant, police investigators identify the geographic area in which criminal activity occurred and seek to identify device users at that location when the crime was committed. *Arson*, 497 F. Supp. 3d at 351. Google calculates the location of a device that has enabled Google location history using input from cell towers, GPS, and signals from nearby wireless internet networks ("Wi-Fi") and Bluetooth beacons. *United States v. Rhine*, No. 21-0687, 2023 WL 372044, at *17 (D.D.C. Jan. 24, 2023). Because Google location history includes multiple inputs, it is "considerably more precise than other kinds of location data." *Id*. For each device, Google retains subscriber information which may include the subscriber's name, address, telephone number, and other identifiers. *Arson*, 497 F. Supp. 3d at 351. Law enforcement officers use a geofence search warrant to seize

–8–

this data using a multi-step process to identify criminal suspects and potential witnesses to the crime.  *See D.C. Google I*, 579 F. Supp. 3rd at 71–72.

In this case, Detective Loeb submitted a warrant application outlining a three-step search process.  In the first step, Google would be asked to create an anonymized list of all devices located within the "target location" during the time period of 2:45 a.m. to 3:10 a.m. on June 24, 2018.  The application defined the target location using four latitude and longitude coordinates connected by straight lines and included a visual reference image of the search area.



As shown, the search area was limited to the house where the offense occurred and a portion of the church property across the street.

Once the anonymized list was produced, law enforcement would then analyze the data to identify users who may have witnessed or participated in the offense.  For

those users identified as relevant to the investigation, Google would then provide additional anonymized location history outside of the target location for a period not to exceed sixty minutes before and after the last timestamp associated with the device within the target location. The purpose of this additional information was to eliminate users who, based on the contextual data, did not appear to fall within the scope of the warrant. For the accounts determined to be relevant after this narrowing process, Google would then provide the subscriber information, including the user's name and email address.

In addition to the search description, the warrant application included background information on Google's location services, discussion of the prevalence of Google accounts on cellular phones, and a probable cause statement by Loeb. The probable cause statement laid out the basic facts of the offense. It was noted that surveillance video obtained from the church showed the suspects gathering in the parking lot behind one of the church buildings across the street from the victim's house just prior to the offense and showed the suspects fleeing immediately afterwards in a car that was left parked in the lot. Loeb stated it was likely that at least one of the four suspects had a device on him during the commission of the offense that had enabled Google location services. He opined that "[i]t is common practice that home invasion robbery suspects keep an open line with someone outside of the residence while committing this type of offense to keep an eye out for responding police officers." It was also noted that the initial shooting of Dickerson

occurred outside the house in the front yard, and the police were looking not only for persons involved in the offense, but also for those who were present at the time as potential witnesses.

A district judge approved the warrant and, as a result of the initial search, Google identified three devices in the target location at the time of the offense. Once the search was expanded, Loeb narrowed the search to a single Google account that "was determined to belong to a suspect who clearly had involvement in this offense." The account belonged to appellant and, with appellant's name, email address, and Google account identification number, Loeb obtained a second warrant for appellant's Google account information. Appellant does not challenge this second warrant other than as the "fruit of the poisonous tree."

Google account records provided in response to the second warrant showed that appellant had changed his phone number since he created his Google account. A woman using appellant's former phone number gave Loeb appellant's new number. A warrant was then issued to T-Mobile for appellant's phone records, including cell-site location information. The phone records confirmed that appellant was in the area at the time of the offense. The records also showed the persons with whom appellant was in communication around the time of the offense. Through social media, detectives were able to identify Prentice, Groom, and Watkins as the other three men involved in the offense based on their distinctive tattoos.

Prior to trial, appellant moved to suppress the information obtained through the geofence warrant. Appellant argued the search was an unreasonably broad invasion of privacy and unsupported by probable cause. The State responded that appellant did not have a reasonable expectation of privacy in the State's limited search of his phone's location history. The State additionally contended the motion should be denied because the warrant was valid and, alternatively, suppression of the evidence was inappropriate under the good faith exception to the exclusionary rule. The trial court denied appellant's motion to suppress, and the evidence was admitted.

On appeal, appellant argues the State's search pursuant to the geofence warrant was a violation of the Fourth Amendment's constitutional guarantee against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. The ultimate measure of the constitutionality of a governmental search is its "reasonableness." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Whether a particular search is reasonable is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Id.* at 652–53. Where a search is conducted by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires a warrant. *Id.* at 653. The United States Supreme Court has determined that, to be compliant with the Fourth Amendment, a warrant must meet three requirements: (1) it must be issued by a neutral, disinterested magistrate; (2) it must be supported by probable

cause that the evidence sought will aid in a "particular apprehension or conviction for a particular offense"; and (3) it must particularly describe the things to be seized and the place to be searched. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Appellant asserts the State's geofence warrant in this case failed to meet the second and third requirements.

The issuance of a warrant is supported by probable cause if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a fair probability that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued. *State v. Jordan*, 342 S.W.3d 565, 568–69 (Tex. Crim. App. 2011). "The magistrate may interpret the affidavit in a non-technical, common-sense manner, and may draw reasonable inferences from the facts and circumstances contained within its four corners." *Id*. at 569. We give great deference to the magistrate's determination of probable cause and, on review, only ensure the magistrate had a substantial basis for concluding probable cause existed. *Id*.

The particularity requirement is related to the probable cause requirement because it allows the magistrate to determine whether probable cause exists for the requested search. *Bonds v. State*, 403 S.W.3d 867, 875 (Tex. Crim. App. 2013). Among the objectives of requiring particularity with respect to the place to be searched and things to be seized are: (1) limiting the officer's discretion by narrowing the scope of the search, and (2) minimizing the danger of searching the

person or property of an innocent bystander or property owner. *Id*. at 874–75. Primarily, the requirement is "meant to prevent general searches and the seizure of one thing under a warrant that describes another thing to be seized." *State v. Powell*, 306 S.W.3d 761, 765 (Tex. Crim. App. 2010).

Geofence warrants are a relatively new addition to the array of investigative tools available to law enforcement. Because of this, the amount of case law on this type of warrant is limited. *See Rhine*, 2023 WL 372044, at *17. But, while the cases are not numerous, those that have addressed the constitutional issues raised by geofence warrants have done so in depth. *See e.g. id*. at *21–27 (surveying geofence warrant cases). We find the reasoning in these opinions to be consistent, persuasive, and instructive on the warrant presented here. *See Price v. Super. Ct. of Riverside Cnty*, No. E078954, 2023 WL 4312776, at *11 (Cal. App. 4th July 3, 2023).

The case of *Price v. Superior Court of Riverside County* has strikingly similar facts to those presented in this case. In *Price*, a man was shot on the front porch of his home in a residential area. *Id*. at *3. The man's brother was a witness to the offense and saw two men flee the scene in opposite directions — one ran north, while the other got into a vehicle and headed south. *Id*. Surveillance video from a gas station nearby showed the same vehicle later heading east on a different street. *Id*. at *4.

A detective obtained a warrant seeking location history information from Google for devices located within a geofence encompassing the front yard of the

victim's house, including the front porch area where the shooting occurred, and the street in front of the house for the lengths of two houses heading north and south. *Id*. at *5. Based on the timing of multiple 911 calls received about the offense, the time period specified for the first stage of the search was from 10:00 p.m. to 10:22 p.m. *Id.* In his affidavit in support of the warrant, the detective averred that "in his experience people who plan and commit crimes together use cell phones to communicate." *Id*. at *11.

The first search revealed five devices within the geofence during the twenty-two-minute time period. *Id*. at *5. The second stage of the search provided a "more expanded view" of the location and movements of the five devices and indicated that two of the devices travelled past the gas station where the suspects' car was recorded on video surveillance. *Id*. at *4–*5. The third stage of the search revealed the identity of the Google account subscribers for the two devices identified as relevant. *Id*. at *5. Additional warrants were then secured to obtain the Google account and cellular phone records for the suspects. *Id*.

In its review of the constitutionality of the geofence warrant, the court in *Price* concluded the warrant was both supported by probable cause and a "model of particularity." *Id*. at *14. Given the specificity of the geofence and the "indisputable common knowledge that most people carry cell phones virtually all the time," the court reasoned there was at least a "fair probability" that the suspects in the murder would be identified in the search. *Id*. at *12. The court went on to state that

> if a geofence warrant is narrowly tailored, in its initial search parameters, or geographic scope and time period, to maximize the probability it will capture only suspects and witnesses, and to minimize searches of location data and identifying information of individuals for whom there is no probable cause to believe [they] were suspects or witnesses (uninvolved individuals), then the discretion afforded to the executing officer by Google's multi-step production protocol will be constitutionally immaterial.

*Id*. at *13.

The geofence warrant in this case was equally likely to reveal evidence of the identities of suspects and potential witnesses to the offense, and it was even more likely than the warrant in *Price* to exclude uninvolved persons. Like the warrant in *Price*, the geofence here encompassed only the area where the suspects were known to have been at the time of the offense. Also like *Price*, the area was residential in nature, made up largely of single family homes, and was not heavily trafficked at the time. Because the period for the initial search in this case was between 2:45 a.m. and 3:10 a.m., there was a significantly diminished possibility that anyone uninvolved would be located in or around the search area, which included only the victim's house and a then-closed church building. Additionally, because one of the shootings took place outside the house, there was a strong possibility that everyone within the geofence would have witnessed at least part of the offense.

Although it is unclear whether or to what extent the second stage of the location history search in *Price* was limited in time, the warrant here limited the anonymized information produced in the second stage to only location history for a period of sixty minutes before and after the initial search period, for a maximum

time of approximately two and one-half hours. This limited time-frame in the early morning hours of a single day would not provide nearly the "all-encompassing record" or "intimate window into a person's life" that concerned the United States Supreme Court when it addressed the seizure of one hundred and twenty-seven days of historical cell-site information in *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

Appellant acknowledges that the three-step narrowing process used in the State's geofence warrant "effectively filtered out the innocent," but argues the initial search impermissibly included innocent third parties merely because they were present in an area where a crime was committed. As we have already established, however, the warrant in this case, even in its initial stage, was unlikely to identify persons who were not either a suspect or witness to the offense. Furthermore, a search is not constitutionally impermissible simply because it *may* infringe on the privacy interests of uninvolved third persons. *Rhine*, 2023 WL 372044, at *26; *D.C.*, 579 F. Supp. 3d at 84; *Arson*, 497 F. Supp. 3d at 361. It is sufficient that the warrant did not have the potential for revealing the personal information of a substantial number of uninvolved persons. *Rhine*, 2023 WL 372044, at *26.

Appellant argues that, to demonstrate probable cause for the warrant, the State was required to provide specific evidence showing the suspects were carrying cell phones with enabled Google location services and that the phones would contain evidence of the crime. As multiple courts, including the United States Supreme

Court, have recognized—cell phones are ubiquitous. *See Carpenter*, 138 S. Ct. at 2218. Judges are not required to "check their common sense at the door and ignore the fact that most people compulsively carry cell phones with them all the time." *United States v. James*, 3 F. 4th 1102, 1105 (8th Cir. 2021). Detective Loeb's affidavit explained that, in his training and experience, co-conspirators in a home-invasion robbery use phones to keep an open line with someone outside the residence. The affidavit further stated that "nearly every cellular phone using the Android operating system has an associated Google account" and non-Android devices may also have Google accounts that are used by the company for location-based services, advertising, and search results. Although it is possible the suspects were not carrying cell phones with enabled Google location services during the offense, probable cause is about "fair probabilities," not near certainties. *Id*.; *see also Arson*, 497 F. Supp. 3d at 355 ("probable cause does not require conclusive evidence that links a particular place or item to a crime"). As for establishing how the cell phone would contain evidence of the offense, the affidavit in support of the warrant made clear that police were seeking the identities of persons who were at the scene through use of the phone's location data. *See Price*, 2023 WL 4312776, at *11.

Appellant relies heavily on the case of *United States v. Chatrie*, 590 F.Supp.3rd 901 (E.D. Va. 2022), to argue the State's geofence warrant was overbroad. Appellant's reliance is misplaced. In *Chatrie*, the court held a geofence

warrant was impermissibly overbroad because it failed to establish particularized probable cause to search every Google user within the geofence. *Id*. at 929. The geofence at issue encompassed 17.5 acres in a commercial area between the hours of 4:20 p.m and 5:20 p.m. *Id*. at 922. The court concluded the warrant was "completely devoid of any suggestion that all, or even a substantial number of the individuals searched had participated in or witnessed the crime." *Id*. at 929. In contrast, the geofence warrant before us was as narrowly tailored as possible to capture only location data for suspects and potential witnesses.

The geofence warrant cases to date can generally be divided into two categories— those in which the geofence search warrant was found constitutionally infirm because it was not sufficiently limited as to time and place so as to restrict the executing officer's discretion and minimize the danger of searching uninvolved persons,[3] and those in which the warrant satisfied the Fourth Amendment because it established probable cause to search every person found within the geofence area.[4] Based on the analysis above, we conclude the warrant here falls into the second

---

[3] *People v. Meza*, No. B318310, 2023 WL 5287224, at *11 (Cal. Ct. App. 2023); *Chatrie*, 590 F. Supp. 3d at 929; *In re Search of Info. that is Stored at the Premises Controlled by Google ("Kansas")*, 542 F. Supp. 3d 1153, 1158 (D. Kan. 2021); *In re Search of Info. Stored at Premises Controlled by Google ("Pharma I")*, No. 20 M 297, 2020 WL 5491763, at *7 (N.D. Ill. July 8, 2020); *In re Search of Info. Stored at Premises Controlled by Google ("Pharma II")*, 481 F. Supp. 3d 730, 756 (N.D. Ill. 2020).

[4] *Price*, 2023 WL 4312776, at *18; *In re Search of Info. that is Stored at Premises Controlled by Google ("Texas")*, No. 2:22-mj-01325, 2023 WL 2236493, at *14 (S.D. Tex. Feb. 14, 2023); *United States v. Smith*, No. 3:21-cr-107-SA, 2023 WL 1930747, at *10 (N.D. Miss. Feb. 10, 2023) (warrant not overbroad, but officers failed to follow process set out in warrant); *Rhine*, 2023 WL 372044, at *32 (warrant not overbroad, but second warrant used to obtain de-anonymized information); *D.C. Google I*, 579 F. Supp. 3d at 80–81; *Arson*, 497 F. Supp. 3d at 363.

category.  Even when the geofence warrant was found to be invalid, however, courts have refused to exclude evidence resulting from the search.  This is because evidence obtained in objective good faith reliance upon a warrant that is valid on its face is an exception to the exclusionary rule.  *See United States v. Leon*, 468 U.S. 897, 922 (1984); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.23(b); *McClintock v. State*, 541 S.W.3d 63, 73 (Tex. Crim. App. 2017).  "Given the dearth of authority directly on point and the novelty of the particular surveillance technique at issue," courts have determined evidence obtained through an invalid geofence warrant was nevertheless admissible because it was not "objectively unreasonable" for officers to believe the warrant was valid.  *Meza*, 307 Cal. Rptr. 3d at 544; *Chatrie*, 590 F. Supp. 3d at 938.  Appellant here makes no argument that it was objectively unreasonable for Detective Loeb to rely on the geofence warrant to obtain his location history.  Accordingly, even if the warrant was invalid, appellant has failed to show the trial court erred in refusing to grant his motion to suppress.

Because we conclude the warrant at issue satisfies the requirements of the Fourth Amendment and, alternatively, Detective Loeb's reliance on the warrant was objectively reasonable, it is unnecessary for us to address the State's argument that appellant had no reasonable expectation of privacy in his location history.[5]  We resolve appellant's second issue against him.

---

[5] We note that no case has been willing to go as far as the State suggests and hold that law enforcement officers do not need to obtain a warrant before searching Google's location history data stores.  The State

## III. Google Location Data Reliability

In his third issue, appellant contends the trial court abused its discretion in allowing the State's mapping expert, Greg Gambrell, to testify about appellant's location history based, in part, on the data obtained from Google. Appellant argues the State failed to show the Google data was reliable. Trial courts are given wide latitude in their rulings on the reliability of expert testimony. *Wilson v. Shanti*, 333 S.W.3d 909, 913 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). If there is evidence supporting the trial court's decision to admit the challenged evidence, there is no abuse of discretion and we must defer to that decision. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

In a hearing outside the presence of the jury, Gambrell testified he was a graphic digital multimedia evidence specialist who was certified in call detail records and geolocation analysis. To receive the certification, Gambrell completed five years of training through the FBI, the United States Secret Service, and the National White Collar Crime Center. Gambrell also completed approximately one

---

cites *Sims v. State* in which the Texas Court of Criminal Appeals held a defendant did not have a legitimate expectation of privacy in his physical movements or location as revealed by three hours of real-time surveillance done by "pinging" his phone. *See Sims v. State*, 569 S.W.3d 634, 645 (Tex. Crim. App. 2019). As the U.S. Supreme Court has observed, however, historical location information maintained by a third party "does not fit neatly under existing precedents." *Carpenter*, 138 S. Ct. at 2214. Law enforcement's real-time tracking of a known, and potentially dangerous, suspect, and its search of a vault of historical location data to determine the whereabouts of unknown persons and innocent bystanders, are fundamentally different things. We share the concern of other courts that "current Fourth Amendment doctrine may be materially lagging behind technological innovations." *Chatrie*, 590 F. Supp. 3d at 925. And we bear in mind that the central aim of the Framers was "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 138 S. Ct. at 2214 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)).

hundred and twenty hours of training on the use of ZetX software, which creates illustrations of location histories.

Gambrell testified he input thousands of lines of appellant's location history data, obtained from both Google and appellant's phone service provider, into the ZetX program to create maps showing appellant's movements. Gambrell stated the records he received from Google were certified and ZetX provides a failsafe that detects if records have been altered. Google additionally provided a business records affidavit stating that Google servers recorded the data automatically at the time, or reasonably soon after, it was transmitted by appellant's device, and the data was kept in the ordinary course of business. The Google affidavit averred the records it produced were "a true duplicate of original records that were generated by Google's electronic process or system that produces an accurate result" and "[t]he accuracy of Google's electronic process and system is regularly verified by Google."

Gambrell discussed how the Google data was collected using Wi-Fi, GPS, and cell towers, and he stated the spreadsheets of location data provided by Google specify which of these sources produced each data point along with its range of accuracy. According to Gambrell, the range of accuracy is within ten meters for GPS, within one hundred meters for Wi-Fi, and within miles for cell towers. Gambrell elaborated on how each of these technologies collects location data from cellular devices and testified that all three are considered valid sciences accepted among the scientific community. He further stated Google relies on the accurate

–22–

collection of location information as part of its business model to provide location services and targeted advertising.

With respect to the specific Google data used in this case, Gambrell testified he verified its accuracy in several ways. First, he compared the location data received from Google to the cell-site location data received from appellant's phone service provider to determine if there were any conflicting data points. Next, he looked to other evidence in the case, such as the surveillance videos, to confirm that it correlated with the Google data. He also looked within the Google data itself for anomalies or outliers that would indicate it was inaccurate. As a final confirmation, Gambrell manually validated the accuracy range of the Google data points from the crime scene using a measuring wheel. At the conclusion of the hearing, the trial court ruled that Gambrell's testimony, and the State's demonstrative evidence regarding appellant's movements, were admissible.

Appellant contends that Gambrell's testimony did not meet the standard of reliability for expert testimony set out in *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. 1992).[6] For expert testimony to be reliable under *Kelly*, (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *Id*.

---

[6] The State responds that Gambrell's testimony was not based on hard science, but rather on specialized technical training and, therefore, the more flexible standard of reliability set forth in *Nenno v. State* applies. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). Because we conclude Gambrell's testimony met the standards set forth in *Kelly*, we need not address this argument.

Whether a particular field of study is legitimate is the type of question that can be resolved as a general matter so that courts can take judicial notice of the reliability of the type of evidence at issue. *Morris v. State*, 361 S.W.3d 649, 655 (Tex. Crim. App. 2011). Trial courts are not required to "reinvent the scientific wheel in every trial." *Id*.

The evidence the State sought to introduce through Gambrell was maps of appellant's movements in the days leading up to, including, and immediately after the offense. The maps were created using cell-site location data obtained from appellant's phone service provider and GPS, Wi-Fi, and cell-site location data obtained from Google. Appellant challenges only the reliability of the Google location data.

As the State informed the trial court at the hearing, this Court and many others have already concluded that maps based solely on cell-site location data, including specifically ZetX mapping, are sufficiently reliable to be admissible at trial. *See Trevino v. State*, No. 05-19-00295-CR, 2020 WL 2537246, at *8 (Tex. App.—Dallas May 19, 2020, no pet.) (mem op., not designated for publication); *Patrick v. State*, No. 05-18-00435-CR, 2018 WL 3968781, at *30 (Tex. App.—Dallas Aug. 20, 2018 no pet.) (mem op., not designated for publication) (citing multiple other cases); *Thompson v. State*, 425 S.W.3d 480, 489 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *see also Carpenter*, 138 S.Ct at 2216 (cell-site location information provides a detailed and comprehensive record of a person's movements); *United States v.*

*Schaffer*, 439 F. App'x. 344, 347 (5th. Cir. 2011) (field of historical cell-site analysis neither untested nor unestablished). Given that a map based solely on cell-site location information from appellant's phone service provider would have been admissible, appellant fails to explain how a map that combines this same data with the location data provided by Google is rendered less reliable. Indeed, the combination of technologies used by both companies makes it significantly more reliable. *See State v. Pierce*, 222 A.3d 582, 590 (Del. Super. Ct. 2019) (accuracy of Google Wi-Fi location data verified by other mechanisms such as GPS).

In addition to gathering location information through cell towers, Google also mines data from GPS and Wi-Fi routers. GPS in particular is significantly more precise than cell-site location information and has been found by this Court to be reliable. *See Brown v. State*, 163 S.W.3d 818, 824 (Tex. App.—Dallas 2005, pet. ref'd); s*ee also United States v. Beverly*, 943 F.3d 225, 230 n.2 (5th Cir. 2019). Appellant acknowledges this fact in his argument in support of his second issue.

In *State v. Pierce*, the Superior Court of Delaware thoroughly analyzed the reliability of Google's Wi-Fi location data under the standard set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The *Daubert* standard is "virtually identical" to the *Kelly* standard. *See Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997) (en banc). The court in *Pierce* concluded that Google's location data met all the criteria for reliability, including wide acceptance in the scientific community. *Pierce*, 222 A.3d. at 591. The fact that Google uses the

location data for commercial purposes is a recognized indicator of reliability. *Id.*; *see also Carpenter*, 138 S. Ct. at 2217.

In addition to the general reliability of Google's location data, Gambrell independently verified the accuracy of the information he was provided in this case. His verification of the Google location data included corroborating it using appellant's cell phone records and other evidence in the case, as well as manually assessing the accuracy of certain data points using a measuring wheel. This type of independent corroboration supports the trial court's finding of reliability. *See Alyea v. State*, No. 14-19-00498-CR, 2021 WL 5117972, at *3–5 (Tex. App.—Houston [14th Dist.] Nov. 4, 2021, pet. ref'd) (mem. op., not designated for publication).

Appellant argues the State offered no evidence to show "Google's process for culling and delivering data in response to a warrant or court order." As observed by the court in *Chatrie*, Google is always collecting location data and stores *all* of the data it collects in a vast "Sensorvault." *Chatrie*, 590 F.Supp.3d at 909. The warrant served on Google in this case ordered the company to turn over "all location data" associated with appellant's Google account for the time period of June 1, 2018 to June 30, 2018, including GPS, Wi-Fi, or Bluetooth sourced location history data generated from devices associated with appellant's Google account, and all data "collected or maintained by Google Location Services and/or Google Location History and any stored location data from or derived from GPS, Wi-Fi access points, cell tower triangulation/trilateration or other measurement" related to appellant's

Google account. There is nothing in the record to suggest Google did not turn over all the information the State requested.

Appellant points to the testimony of his defense expert, Steve Watson, concerning the unreliability of Google's data. Most, if not all, of this testimony was offered by the defense after the trial court had already ruled on the admissibility of Gambrell's testimony. Furthermore, Watson acknowledged the accuracy of the independent technologies relied upon by Google—GPS, Wi-Fi, and cell tower data—to determine location. Watson's focus was on the proprietary, and therefore un-reviewed, algorithm used by Google to combine those inputs to produce the location determination it uses in its services. The data provided by Google in response to the warrant did not employ the algorithm, however. It provided only the raw data points from each of the different sources of location information separately along with their ranges of accuracy. The ranges of accuracy for each data point were fully taken into account by Gambrell and explained to the jury.

We conclude the case law concerning the technology at issue, and the evidence concerning its specific application and reliability in this case, were sufficient to support the trial court's decision to admit Gambrell's testimony. Accordingly, the trial court did not abuse its discretion and we overrule appellant's third issue.

## IV. Motion for Continuance

In his fourth issue, appellant contends "the trial court abused its discretion when it denied his motion for continuance based, in part, on evidence the State did not disclose under *Brady v. Maryland*, 373 U.S. 83 (1963)." He asserts the State failed to turn over evidence relating to the "culpability" of Dickerson, Giddings's girlfriend, and a man whose fingerprint was found on one of the cars at the crime scene. Appellant argues he "undeniably suffered harm because he could not explore the viable theory that Dickerson masterminded [Giddings's] murder." We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Cruz v. State*, 565 S.W.3d 379, 381 (Tex. App.—San Antonio 2018, no pet.).

At the hearing on appellant's motion for a continuance, Jimmy Spurger, an investigator with the public defender's office, testified he had uncovered information about Dickerson after looking into tips received by the Dallas Police Department. Spurger testified these tips were provided to the defense in July 2020, but he did not begin investigating them until September 15, 2021, a few days before the hearing. The first tip stated that Dickerson had Giddings murder her previous husband "Nathaniel" so she could benefit financially. This person also believed Dickerson arranged to have Giddings murdered. On the same day, police received a second tip stating that Dickerson was "in on the robbery" and "she was shot to make it look good."

Spurger began researching Dickerson and found a relative named Nathan Williams who was murdered in 2012. A CLEAR report on Williams stated he was associated with both Dickerson and Giddings and showed him living at the house where Giddings was killed from September 2016 to January 2018, well after his death in 2012. A man named Ghiri Johnson was also listed as an "associate" of Williams and a "relative/associate" of Dickerson and Giddings. A fingerprint of Johnson's was found at the scene of Giddings's murder. Spurger requested a copy of the file on William's murder, and the State turned it over the same day.

At the hearing on appellant's motion, defense counsel stated she wanted to make it clear she was not accusing the State of hiding anything. Her argument was only that the State had failed in its obligation to investigate these tips and they "should have found the *Brady*." Counsel asked for additional time to review the file on Williams's murder. The trial court denied the motion.

A *Brady* violation occurs when the State suppresses, willfully or inadvertently, evidence favorable to the appellant. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (en banc). *Brady* does not require the State to disclose exculpatory information that it does not know exists. *Id*. at 407. Nor does the State have any duty to seek out such information independently on the defendant's behalf. *Duncan v. State*, No. 05-96-01027-CR, 1997 WL 691438, at *6 (Tex. App.—Dallas Nov. 6, 1997, pet. ref'd) (not designated for publication); *Palmer v. State*, 902 S.W.2d 561, 563 (Tex. App.—Houston [1st Dist.] 1995, no pet). If the defendant,

–29–

using reasonable diligence, could have obtained the information about which he complains, there is no *Brady* violation. *Duncan*, 1997 WL 691438, at \*6; *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).

Here, the record shows the State did not withhold or suppress evidence. The State simply did not pursue two tips it received. Those tips were timely provided to the defense. Although the defense was in possession of the tips for more than a year, it did not begin to investigate them until shortly before trial. We conclude appellant has failed to show a *Brady* violation and the trial court did not abuse its discretion in denying appellant's motion for a continuance. We resolve appellant's fourth issue against him.

## V. Accomplice Witness Testimony

Appellant's fifth issue challenges the sufficiency of the evidence to support his conviction. Appellant argues he was convicted based on the testimony of Kiante Watkins, one of the other three men involved in the offense, and the State failed to submit sufficient evidence to corroborate Watkins's version of what occurred. To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the defendant with the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14. Corroborating evidence is not enough if it merely shows the offense was committed. *Id*. But even apparently insignificant incriminating circumstances, including confirming a mere detail, may provide sufficient corroboration. *Medrano v. State*, 421 S.W.3d 869, 883 (Tex. App.—

–30–

Dallas 2014, pet. ref'd). We look at the facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Id.* While the defendant's presence at the scene of the crime is insufficient by itself to corroborate accomplice testimony, proof that the defendant was at or near the scene, when coupled with other suspicious circumstances, may be sufficient corroboration to support a conviction. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

The location data generated by appellant's phone showed he was at Giddings's house when Giddings was murdered. It also showed that he visited Giddings's neighborhood twenty days before the offense. Giddings's security camera recorded four men entering the house. Appellant's phone records demonstrate that, in the weeks leading up to and including the day of the offense, he was communicating with the other three men seen in the security camera footage when the offense occurred. His phone records also show he made a call from the church parking lot across from Giddings's house immediately before Giddings and Dickerson were attacked. Appellant's internet search history includes searches for news about the offense and indicates appellant began reading a Dallas Police Department blog, including a section on unsolved 2018 homicides, immediately after the offense was committed.

Watkins testified that all four men arrived and fled from the scene in appellant's red Jeep Cherokee. Church surveillance video showed a Jeep Cherokee

leaving the church parking lot after the offense. The State submitted documentation into evidence showing appellant purchased a red Jeep Cherokee approximately one month before the murder. A few days after the offense, appellant was searching online about how to reset the oil sensor for a Jeep Cherokee, indicating he still owned the vehicle.

Although appellant attempts to discredit some of this evidence and Watkins's testimony in general, it was solely within the province of the jury to weigh the evidence and evaluate credibility. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We conclude there was sufficient evidence tending to connect appellant to the offense and to corroborate Watkins's testimony. *See Malone*, 253 S.W.3d at 257. We resolve appellant's fifth issue against him.

## VI. Conspiracy Liability Instruction

In his final issue, appellant contends the trial court erred in instructing the jury on conspirator liability. The challenged instruction, which tracks the language of section 7.02(b) of the penal code, stated,

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*See* TEX. PENAL CODE ANN. § 7.02(b). Appellant argues this instruction allowed the jury to convict him without finding the specific intent required for the offense. He further argues the instruction allowed the jury "to convict the non-shooter as a party

–32–

and similarly impose the death penalty" without being required to find the non-shooter intended to cause the death or that the shooter intended to cause the death. Appellant is mistaken.

It has long been the law in Texas that a person can be convicted of capital murder as a party to the offense without having had the intent to commit the murder. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992). All the State was required to prove in this case was that (1) appellant conspired with the group to commit robbery, (2) the murder occurred in furtherance of the robbery, and (3) the murder should have been anticipated as a result of carrying out the robbery. *Martinez*, 330 S.W.3d at 902. The court's charge properly instructed the jury on these elements.

Contrary to appellant's suggestion that a finding of guilt based on conspiracy liability allows a defendant to be sentenced to death without a finding of intent, the code of criminal procedure requires additional findings before a defendant who was found guilty as a party to capital murder can be subjected to the death penalty. If a defendant is found guilty of a capital offense for which the State seeks the death penalty, the trial court must conduct a separate sentencing proceeding to determine whether the defendant will be sentenced to death or life in prison without parole. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(a). In cases where the jury charge allowed the jury to find the defendant guilty as a party at the guilt/innocence stage, the jury must be asked in the separate sentencing proceeding "whether the defendant

actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that human life would be taken." *Id*. § 2(b)(2). Regardless, the State in this case did not seek the death penalty and, therefore, appellees arguments are unavailing. *See Cienfuegos v. State*, 113 S.W.3d 481, 495 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

We conclude the trial court's charge to the jury on conspiracy liability was proper. We overrule appellant's sixth issue.

Based on the foregoing, we affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Publish
TEX. R. APP. P. 47.2(b)
210855F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

AARON RAYSHAN WELLS,
Appellant

No. 05-21-00855-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 4, Dallas County, Texas
Trial Court Cause No. F19-75986.
Opinion delivered by Justice
Reichek. Justice Goldstein
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered August 23, 2023